**Raymond RUSNAK, Plaintiff,**

**v.**

**HOUSING AUTHORITY OF THE CITY OF BRIDGEPORT, Clarence Craig and Olive Harbor, Defendants.**

**No. 3:94–CV–1131 (EBB).**

United States District Court, D. Connecticut.

May 13, 1997.

Thomas E. Mangines, Brian A. Mangines, Mangines & Mangines, Fairfield, CT, for plaintiff.

Joseph A. Siciliano, Stratford, CT, Thomas W. Bucci, Heidi C. Clark, Willinger, Shepro, Tower & Bucci, Bridgeport, CT, for defendants.

*RULING ON DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL*

ELLEN B. BURNS, Senior District Judge.

On May 24, 1996, a jury returned a verdict in favor of Plaintiff Raymond Rusnak on his claims of age discrimination and breach of an implied employment contract. Defendant Bridgeport Housing Authority has moved for judgment as a matter of law or, in the alternative, for a new trial. For the following reasons, the Court DENIES Defendant's Motion for Judgment as a Matter of Law [Doc. No. 51] and GRANTS Defendant's Motion for a New Trial [Doc. No. 51].

## I. BACKGROUND

### A. INTRODUCTION

On March 27, 1992, Plaintiff Raymond Rusnak ("Rusnak") was discharged from his employment as a personnel administrator at Bridgeport Housing Authority ("BHA"). Rusnak sued BHA for retaliatory discharge in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(d) ("ADEA"), and for breach of an implied contract. Rusnak alleged that his supervisor discharged him because he assisted another employee in filing an age discrimination grievance against BHA. Rusnak further alleged that BHA's purported reason for his discharge—the need to eliminate his position due to budget constraints—was a pretext.

With respect to his second count, Rusnak claimed that BHA made certain representations in its effort to persuade him to accept the job. These statements, Rusnak contended, created an implied contract that he would be discharged for cause only. Rusnak's retaliatory discharge violated this implied contract.

### B. EVIDENCE AT TRIAL

#### 1. Testimony of Raymond Rusnak

At trial, Rusnak testified to the following:

Rusnak started working at BHA as the personnel administrator in March 1989. (Trial Transcript ("Tr.") at 25.) However, on April 19, 1989, he resigned to accept a higher-paying job with a company called Swank, Inc. (Tr. at 27.) Prior to leaving BHA, Rusnak met with Clarence Craig, the executive director of BHA, and Ernest Mosely, the deputy director of BHA, to discuss his decision. (Tr. at 28.) At the meeting, Craig told Rusnak that he liked Rusnak's work and wanted him to stay. (Tr. at 29.) Craig stated that he would try to match Swank's salary. He also stated that Rusnak would have the opportunity eventually to serve as the personnel director and to head his own department at BHA. (Tr. at 30.) However, Craig could not make any guarantees until he obtained approval from the commissioners of BHA. (Tr. at 30–31.) Rusnak told Craig that, without those guarantees, he must accept Swank's offer.

Several weeks after Rusnak started at Swank, Olive Harbor, the finance director of BHA,[1] called him to report that the commissioners had approved the salary increase. (Tr. at 33.) She did not mention any other commitments. Rusnak accepted the offer on the telephone. Rusnak's offer letter confirmed his new salary[2] and stated that BHA looked forward to a long-lasting relationship. (Tr. at 35.)

On May 22, 1989, Rusnak returned to his position as BHA's personnel administrator. (Tr. at 35–36.) During Rusnak's employment at BHA, Harbor and Craig routinely evaluated his performance and awarded him high ratings. (Tr. at 41.) Rusnak also received merit-based salary increases.

Within his capacity as personnel administrator, Rusnak served as BHA's equal employment opportunity ("EEO") officer. (Tr. at 39.) His duties included assisting employees in writing and filing grievances against

---

1. While employed at BHA, Rusnak reported to Harbor. (Tr. at 26.0.)

2. Rusnak's salary was increased from $28,000 to $38,000. (Tr. at 34–35; Joint Exhs. 3 & 4.)

BHA regarding equal employment opportunity.[3]

On March 3, 1992, a fellow employee, William Kinsella, met with Rusnak because he wanted to file an age discrimination grievance pursuant to BHA's internal grievance procedure. (Tr. at 43–44.) Harbor had asked Kinsella to resign, and he believed he was being discharged due to his age.[4] Rusnak explained to Kinsella that it was his duty to assist him in writing and filing a grievance. (Tr. at 44.) He then told Kinsella what information to include in his grievance letter. (Tr. at 47.)

The next day, Rusnak met with Kinsella at Kinsella's desk, which was located near Harbor's desk, on the other side of a partition. (Tr. at 48.) While speaking with Kinsella, Rusnak observed Harbor watching them from her desk. (Tr. at 48–49.) Rusnak reviewed the grievance that Kinsella had prepared and expressed his belief that Kinsella had a strong case. (Tr. at 49–50.) Rusnak then delivered the letter to Craig's office.

Shortly thereafter, Harbor called Rusnak into her office and warned him that she expected complete loyalty.[5] (Tr. at 53.) Rusnak told her that he was simply fulfilling his obligation as EEO officer, but Harbor said that she did not care. (Tr. at 54.) Rusnak went back to his desk, retrieved the personnel policy manual, and showed Harbor the article outlining the duties of the EEO officer. Harbor waved it away and again stated that she expected complete loyalty.

On March 26, 1992, Rusnak sent a letter to Kinsella, who had decided to pursue an age discrimination claim, advising him of his options under the equal employment opportunity law. (Tr. at 57.) Rusnak delivered copies of this letter to Harbor and Craig. (Tr. at 58.) The next day, on March 27, 1992, Harbor informed Rusnak that he was being terminated. (Tr. at 55, 58.) Rusnak's termination letter indicated that BHA was eliminating his position due to a recurring monthly deficit. (Tr. at 56.)

Rusnak testified that, from the date of his termination to the date of trial, he lost $61,942 in back pay.[6] (Tr. at 78.) However, Rusnak subsequently acknowledged that this figure did not take into account the $15,216 he collected in unemployment compensation during this period. (Tr. 80–82.) Rusnak also claimed that he had lost $11,867 in lost vacation and holiday pay from the date of termination to the date of trial.[7] (Tr. at 86–87.) In addition, Rusnak paid $1,283 in premiums for health and dental benefits during this period. (Tr. at 84.)

With respect to future losses, Rusnak testified that he should receive $104,507 in income that he otherwise would have earned had he remained at BHA until age sixty.[8]

3. This duty was expressly set forth in BHA's personnel policy manual. Article 35 of the manual states:

    If a Housing Authority employee has a complaint or grievance regarding equal employment opportunity, the employee shall contact the EEO officer, personnel administrator, for the Housing Authority within ten calendar days of the date the act occurred.... The EEO officer will provide assistance to the complainant in the writing and filing of a complaint upon request from the complainant. (Tr. at 39.)

4. Kinsella's grievance was specifically filed against Harbor. (Tr. at 111–12.)

5. Harbor denied ever making this statement to Rusnak. (Tr. at 319.)

6. In calculating this figure, Rusnak subtracted earnings that he had made since leaving BHA. (Tr. at 77, 79.) The figure includes an annual pay increase of four percent and interest at a rate of five percent. (Tr. at 79.)

7. In calculating this figure, Rusnak subtracted the vacation and holiday pay received from two subsequent employers, United Home Services and Sodexho U.S.A. (Tr. at 87.) The figure includes interest at a rate of five percent. (Tr. at 87–88.)

    On cross-examination, BHA's counsel questioned Rusnak regarding whether or not this vacation and holiday pay was part of his salary package with BHA. counsel suggested that these items were included in Rusnak's back pay claim and should not be treated as separate damages. (Tr. at 166–68.)

8. In calculating this figure, Rusnak assumed that he would earn a pay increase of four percent each year; and that, through subsequent employment, he would be able to recoup eighty percent of what he would have earned had he continued working at BHA. (Tr. at 96–98.) Rusnak reduced this figure to its present value. (Tr. at 96.)

(Tr. at 96.) Rusnak also calculated $121,224 in pension benefits that he would have received if he had retired from BHA at age sixty.[9] (Tr. at 103.)

On cross-examination, Rusnak conceded that he had made misrepresentations in the resume that he submitted to BHA in 1989. Rusnak's resume stated that he had received a bachelor's degree in business management from Southern Connecticut State University in 1989. (Tr. at 129.) However, at trial, Rusnak testified that he received the degree in 1992. (Tr. at 22–23, 112.) Thus, although he had approximately 120 credits toward his degree,[10] Rusnak did not yet have a bachelor's degree in 1989. (Tr. at 129.) One of the required qualifications for the position of personnel administrator was a bachelor's degree in related study. (Tr. at 125.) Rusnak denied making the same misrepresentation during his interview with Harbor.[11] (Tr. at 376.)

Rusnak also conceded on cross-examination that he had misrepresented to the jury the reason for the termination of his subsequent employment with Sodexho U.S.A. ("Sodexho"). On direct examination, Rusnak testified that he started working for Sodexho as a consultant in May 1995. (Tr. at 84.) Rusnak later stated during cross-examination that his position was eliminated because Sodexho no longer needed his services. (Tr. at 122.) However, upon further questioning, Rusnak admitted that he had been terminated because one of his supervisors did not want him to continue as a consultant. (Tr. at 250–51.)

## 2. Testimony of Olive Harbor

Harbor testified at great length about the budgetary problems BHA was facing at the time of Rusnak's termination. As the finance director, Harbor was responsible for preparing and managing the budget. (Tr. at 272.) Each July, Harbor submitted the budget to the United States Department of Housing and Urban Development (HUD) for its approval. (Tr. at 284.) BHA receives most of its income from HUD in the form of a subsidy. BHA's other primary source of income consists of rents that it collects from residents of its housing complexes. (Tr. at 285.)

After submitting the budget to HUD in July 1991, three events occurred that led Harbor to conclude the budget was out of balance. First, the budget anticipated that renovations of one of BHA's housing complexes would be completed by January 1992. (Tr. at 286.) However, in August and September of 1991, Harbor learned that the construction would be delayed and the complex could not be occupied by that date. (Tr. at 286, 350–51.) As a result, BHA would not be able to start collecting rents at the time anticipated in the budget. Second, Harbor learned that HUD had reduced BHA's subsidy for the year ending September 30, 1991 because Congress had approved only ninety-five percent of BHA's funding for that year. (Tr. at 286.) Third, Blue Cross informed BHA that the cost of its health insurance would increase by forty-three percent the next year. (Tr. at 286–87.) Because of these three events, BHA's budget showed a deficit of one million dollars. (Tr. at 287.)

After discovering the deficit, Harbor and Craig met to determine what measures were necessary to correct the imbalance. (Tr. at 288–89.) They reviewed all employee salaries to identify any positions that they could eliminate. (Tr. at 290.) Because BHA had already eliminated ten maintenance positions prior to September 1991, Craig and Harbor determined that they could not make further cuts in this area. (Tr. at 292–93.) They then looked at administrative positions and concluded that they could possibly eliminate the position of personnel administrator. Created in 1989 when Rusnak joined BHA, this position was the only one that BHA had operated without in the past. (Tr. at 293.) Following

---

**9.** Rusnak deducted from this figure the $2,574.49, plus $257.48 in interest, that BHA paid him in reimbursement for his plan contributions. (Tr. at 106–07.)

**10.** One-hundred-and-thirty-two credits were required to obtain a degree. (Tr. at 209–10.)

**11.** Harbor, on the other hand, testified that, during the interview, Rusnak told her he possessed a bachelor's degree in business management from Southern Connecticut State University. (Tr. at 325.) She recalled telling him that her sister and her son had attended the same university.

Rusnak's termination, BHA returned to its former procedure and delegated the responsibilities of the position among other employees, namely Harbor and Craig. (Tr. at 300–01.)

Harbor further explained that BHA had been on the troubled housing list up until September 1991. (Tr. at 301.) This list consists of housing authorities operating below generally-accepted standards. Included on this list are authorities that fail to maintain good financial standing. A significant deficit would jeopardize BHA's ability to stay off the list. (Tr. at 302.)

BHA's efforts to correct the deficit succeeded in reducing it by approximately $500,-000. The year-end report for the fiscal year ending September 30, 1992 revealed a deficit of $503,596.27. (Tr. at 303–04.)

### 3. Testimony of Clarence Craig

Craig testified that, when Rusnak decided to accept the offer with Swank, he and Mosely met with him to see if they could convince him to remain at BHA. (Tr. at 366.) Craig told Rusnak that "there was a lot of potential at BHA," and that he wanted Rusnak to stay. (Tr. at 366–67.) However, the only issue discussed at the meeting was Rusnak's salary. (Tr. at 367.)

Craig also testified that Rusnak's termination was part of BHA's effort to reduce the deficit. (Tr. at 369–70.) Although Craig and Harbor did not want to eliminate the position, it was the only one that BHA had operated without in the past. When they were unable to correct the deficit, they eventually had to discharge Rusnak and operate without a personnel administrator. (Tr. at 370.)

When asked about Rusnak's misrepresentation concerning his degree, Craig stated that he would have terminated Rusnak immediately upon learning of the misrepresentation. (Tr. at 373.) However, Craig had never encountered a situation where a job applicant had misrepresented his qualifications. (Tr. at 370–71.)

### 4. Testimony of William Kinsella

Kinsella's testimony confirmed Rusnak's account of the events surrounding Kinsella's grievance. In particular, Kinsella testified that Rusnak reviewed the grievance at Kinsella's desk, which was located approximately ten feet from Harbor's desk. (Tr. at 393.) During this meeting, Harbor was sitting at her desk, watching Rusnak and Kinsella. Rusnak informed Kinsella that he thought he had a clear-cut age discrimination grievance. Shortly thereafter, Kinsella observed Rusnak go into Harbor's office. (Tr. at 394.) He watched Rusnak leave Harbor's office, go to his desk, and then return to her office. (Tr. at 394–95.)

On cross-examination, Kinsella testified that he was aware of the deficit that arose in the budget for fiscal year 1991–1992. (Tr. at 398–99.) He recalled the federal government's decision to reduce BHA's subsidy to ninety-five percent, thereby causing a shortfall in BHA's revenue. (Tr. at 399.) He also recalled that the occupancy of one of the housing complexes was delayed, causing additional budgetary problems.

### C. JURY'S SPECIAL INTERROGATORY ANSWERS

On May 24, 1996, the jury completed a special verdict form and interrogatories, and returned a verdict in favor of Rusnak on both counts of his complaint.

The special interrogatory answers state that the jury found the following: (1) Rusnak proved, by a preponderance of the evidence, all of the elements of a prima facie case of retaliation under the ADEA; (2) BHA did not articulate a legitimate, nondiscriminatory reason for its employment decision regarding Rusnak; and (3) Rusnak proved, by a preponderance of the evidence, that BHA's violation of the ADEA was willful. (Special Verdict Form and Interrogatories to the Jury at 1–2.) The jury further found Rusnak had proved, by a preponderance of the evidence, that an implied contract of employment existed between Rusnak and BHA; and that Rusnak's termination breached the implied contract. (*Id.* at 2.)

The jury awarded Rusnak $46,726.00 in damages for the period from the date of termination until the date of trial. When asked "[w]hat amount of lost pension benefits do you award the Plaintiff," the jury answered, "$30,306 = 1/4," and noted, "less than truthful." (*Id.*) When asked "[w]hat amount of future losses, excluding pension benefits, do you award the Plaintiff," the jury answered, "0.00," and noted, "He found work." (*Id.*) The jury further found that, had he not been terminated, Rusnak would have remained at BHA until age sixty. (*Id.*)

The jury rejected BHA's after-acquired evidence defense, responding in the negative to the following question:

> Do you find from a preponderance of the evidence that (1) the Plaintiff's statement to Olive Harbor during his initial interview that he possessed a degree in Business Management, and/or the Plaintiff's statement on his resume submitted to the Defendant was such misconduct as to warrant the Plaintiff's discharge; and (2) that the wrongdoing was of such severity that the Plaintiff in fact would have been terminated on those grounds alone if the Defendant had known of it at the time of the discharge?

(*Id.* at 3.)

## II. DISCUSSION

### A. LEGAL STANDARDS

■ To obtain judgment as a matter of law under Fed.R.Civ.P. 50(b) (formally called judgment notwithstanding the verdict), BHA must satisfy a strict standard. Judgment as a matter of law is only available " 'when there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or [where there is] such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [the movant].' " *Padilla v. Metro–North Commuter R.R.*, 92 F.3d 117, 122 (2d Cir.1996) (quoting *Logan v. Bennington College Corp.*, 72 F.3d 1017, 1022 (2d Cir. 1995))

■ In assessing a Rule 50(b) motion, the court must view " 'the evidence in the light most favorable to [the non-movant], and [give him] the benefit of all reasonable inferences from the evidence that the jury might have drawn in his favor.' " *Id.* The court may enter judgment as a matter of law "only if, 'without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.' " *Stubbs v. Dudley*, 849 F.2d 83, 85 (2d Cir.1988) (quoting *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir.1970)).

■ The standard for a motion for a new trial under Fed.R.Civ.P. 59 is less stringent. Such a motion may be granted if the jury's verdict is "seriously erroneous" or constitutes a "miscarriage of justice." *Purnell v. Lord*, 952 F.2d 679, 686 (2d Cir.1992); *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970 (2d Cir.1987). Unlike judgment as a matter of law, a new trial may be granted even where there is substantial evidence to support the jury's verdict. *Fisher v. Town of Windsor*, No. 3:94cv02050(AHN), 1997 WL 76669, *1 (D.Conn. Feb.7, 1997). In ruling on a motion for a new trial, the court may weigh the evidence adduced at trial and is not bound to view the evidence in the light most favorable to the non-movant. *Caruso v. Forslund*, 842 F.Supp. 1497, 1499 (D.Conn.1994).

### B. PROTECTED ACTIVITY UNDER THE PARTICIPATION CLAUSE OF THE ADEA

BHA argues that it is entitled to judgment as a matter of law because Rusnak failed to establish a prima facie case of retaliation under the ADEA. As an element of his prima facie case, Rusnak must show that he engaged in protected activity. BHA contends that Rusnak did not offer sufficient evidence at trial to satisfy this element. The Court disagrees.

Title 29 U.S.C. § 623(d) protects two types of activities. First, the statute includes a clause, known as the "opposition" clause, that prohibits employers from discriminating against an employee because he "has opposed any practice made unlawful" by 29

U.S.C. § 623. 29 U.S.C.A. § 623(d) (West Supp.1997). Second, the so-called "participation" clause forbids discrimination against an employee who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." *Id.*

Rusnak alleges that he engaged in protected activity under the participation clause when he helped Kinsella file an internal age discrimination grievance against BHA. BHA, on the other hand, argues that assisting an employee in pursuing an internal grievance does not constitute protected activity under the terms of the clause. At the time of Rusnak's termination, Kinsella had not yet filed a formal charge of age discrimination with the Equal Employment Opportunity Commission ("EEOC") or any other agency; nor had he commenced a civil action in any court. Therefore, BHA asserts, Rusnak has no recourse under the plain language of the participation clause because he never "assisted or participated in any manner in an investigation, proceeding, or litigation under this chapter." [12]

### 1. Scope of the Participation Clause

The Court rejects BHA's reading of the participation clause. First, BHA fails to cite any case law in support of its interpretation. This conspicuous absence of authority is not surprising, as the Court's efforts to locate any such cases were equally unsuccessful. In fact, the relevant case law suggests that application of the participation clause does not turn on the filing of a complaint with the EEOC or the initiation of a lawsuit. *See Grant v. Hazelett Strip–Casting Corp.,* 880 F.2d 1564, 1569–70 (2d Cir.1989).

In *Grant v. Hazelett Strip–Casting Corp.,* the plaintiff, after consulting an attorney, drafted a memo listing job qualifications, including discriminatory preferences; obtained his supervisor's approval of the memo; and later refused to destroy the memo when

warned by the personnel director that the discriminatory preferences violated federal law. *Id.* at 1567. In the Court's view, these circumstances were sufficient to support a finding by the jury that the plaintiff's conduct was protected by the participation clause. *Id.* at 1570. The jury could have concluded that, in asking his supervisor to approve the memo, and in later refusing to destroy it, the plaintiff was attempting to gather evidence for a future lawsuit and was therefore "participat[ing] in any manner in .... litigation" under the ADEA. *Id.* The fact that the plaintiff had not filed a formal complaint with the EEOC or another agency did not automatically deprive him of protection under the participation clause. Indeed, in *Grant,* the plaintiff had not even filed an internal grievance or complaint charging his supervisor with discriminatory conduct. At most, he had started collecting evidence in preparation for a possible lawsuit at some point in the future.

BHA's narrow construction of the participation clause is also at odds with the remedial nature of the ADEA. Courts have recognized that the participation clause should be liberally interpreted to effect the congressional purpose of ending age discrimination in employment. *See, e.g., Bonham v. Dresser Indus., Inc.,* 569 F.2d 187, 192–93 (3d Cir.1977). By its nature, the clause invites this approach as it includes such expansive and undefined terms as "assisted or participated in any manner." 29 U.S.C.A. § 623(d) (West Supp.1997). In *Grant,* 880 F.2d at 1569, the Second Circuit Court of Appeals emphasized the breadth of the clause: "As this choice of language clearly indicates, Congress sought to protect a wide range of activity in addition to the filing of a formal complaint." *See also Holt v. JTM Indus., Inc.,* 89 F.3d 1224, 1226–27 (5th Cir.1996) ("This broad language is consistent with Congress's remedial goals in enacting the ADEA. Congress intended the anti-retaliation provision of the ADEA to enable employees to engage

---

**12.** BHA also argues that it is entitled to judgment as a matter of law because Rusnak failed to make out a prima facie case under the opposition clause of 29 U.S.C. § 623(d). However, Rusnak conceded at trial that he was not pursuing a claim under this clause. When specifically questioned by the Court, Rusnak's counsel stated that Rusnak was proceeding solely under the participation clause. (Tr. at 95.) Accordingly, whether or not Rusnak established a prima facie case under the opposition clause is irrelevant.

in protected activities without fear of economic retaliation.").

BHA apparently relies on the absence of any express reference in the participation clause to an employee who assists in filing an age discrimination complaint pursuant to an employer's internal grievance procedure. However, in the Court's view, the lack of specific wording in this regard is not fatal to Rusnak's prima facie case under the clause. As the Sixth Circuit Court of Appeals has observed:

> ... courts have routinely adopted interpretations of retaliation provisions in employment statutes that might be viewed as outside the literal terms of the statute in order to effectuate Congress's clear purpose in proscribing retaliatory activity. Contrary to defendant's assertions, courts have frequently applied the retaliation provisions of employment statutes to matters not expressly covered by the literal terms of these statutes where the policy behind the statute supports a non-exclusive reading of the statutory language.

*EEOC v. Ohio Edison Co.*, 7 F.3d 541, 545 (6th Cir.1993).

This case involves the exact motivation that Congress intended to combat with the participation clause. The allegedly improper motivation behind Rusnak's termination (i.e., desire to retaliate because he was assisting an employee in asserting his rights under the ADEA) was the same as it would have been if Rusnak had assisted Kinsella in filing a formal complaint with the EEOC. Thus, to insist that Rusnak has no recourse under the literal terms of the clause makes no sense. This rigid interpretation would only subvert congressional intent, by exempting some employers with equally improper motivations from liability under the clause.

Filing an internal grievance deserves protection because it is an intimately related and integral step in the process of bringing formal charges. By filing a grievance, Kinsella was initiating an internal investigation of alleged age discrimination. This measure was the first step in his effort to pursue an age discrimination claim under the ADEA. Approximately one month later, he filed complaints with the EEOC and the Connecticut Commission on Human Rights and Opportunities. (Def.'s Stat. of Undisputed Facts at ¶ 12.) Accordingly, Kinsella's grievance had a sufficiently close connection to the filing of a formal charge to fall within the scope of the clause.

BHA's reading of the participation clause undercuts the policy interests behind the ADEA. Application of BHA's interpretation would deter employees from assisting others in filing internal grievances for fear that they would suffer retaliation without any recourse under the ADEA. In effect, the Court would be discouraging efforts to seek informal resolution of grievances in lieu of (or at least prior to) filing formal charges. The EEOC is saddled with a staggering caseload [13] and limited financial resources.[14] Likewise, federal judicial dockets are overwhelmed by employment disputes.[15] As a result, formal

---

**13.** See *Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir.1996) (noting that the EEOC is "already staggering under an avalanche of filings too heavy for it to cope with...." ) *See also* Kirk Johnson, "Cost–Cutters Turn to In-House Panels to Settle Disputes," *The Journal Record*, Mar. 31, 1995 ("the traditional forums for employee grievances are overwhelmed or beyond the financial reach of many workers. The federal Equal Employment Opportunity Commission, for example, has a backlog of 100,000 unresolved cases") (available on WESTLAW); Peter T. Kilborn, "Backlog of Cases is Overwhelming Job–Bias Agency," *N.Y. Times*, Nov. 26, 1994, at 1.

**14.** See "EEOC Gets Leaner and Meaner to Cope with Caseload," (National Public Radio broadcast, May 14, 1996) ("The EEOC has 2,800 employees and a budget of $233 million, but that makes it smaller and poorer than it was in 1990 when now-supreme-court-Justice Clarence Thomas was serving as commissioner. Yet since 1990, the number of complaints filed each year with the commission has gone up from about 60,000 a year to 100,000 a year ....") (available on WESTLAW).

**15.** *See* Lance Gay & Tom Kisken, "Uproar over Rights Driving Wedge into Heart of America," *The Commercial Appeal*, Oct. 13, 1996 ("The number of employment-related civil rights lawsuits in U.S. district courts increased 128 percent from 1991 to 1995, according to the Administrative Office of the U.S. Courts in Washington."); United States Departments of Labor and Commerce, Fact Finding Report: Commission on the Future of Worker Management Relations (1994) (reporting that between 1971 and 1991, employ-

complaints of discrimination are languishing in judicial and administrative channels, precluding timely and cost-efficient resolution of disputes. This situation underscores the need to ensure that employees can assist others in utilizing informal grievance procedures without the threat of unchecked retaliation.

Finally, as an EEO officer, it was Rusnak's responsibility to assist Kinsella in pursuing his discrimination grievance. BHA's personnel policy manual expressly states: "The EEO officer *will* provide assistance to the complainant in the writing and filing of a complaint upon request from the complainant." (Emphasis added). To allow BHA to retaliate against Rusnak for fulfilling his duty is illogical and impermissible.

Under these circumstances, the Court finds that Rusnak's assistance with Kinsella's internal age discrimination grievance qualifies as protected activity under the participation clause.

### 2. Evidence at Trial

■ At trial, Rusnak offered sufficient evidence that he assisted Kinsella in the preparation and submission of his grievance. Rusnak testified that Kinsella approached him and said that he wanted to file an age discrimination complaint. Rusnak explained to Kinsella what should be included in his grievance letter and said that he would review the letter after it was written. Rusnak subsequently reviewed the grievance and submitted it to Craig. He also sent a letter to Kinsella, who had decided to pursue the age discrimination claim, advising him of his options under the equal employment opportunity law. Kinsella's testimony confirmed Rusnak's account of his efforts. Based on this evidence, the jury reasonably could have concluded that Rusnak engaged in protected activity under the participation clause. Therefore, Rusnak satisfied this element of his prima facie case, and BHA is not entitled to judgment as a matter of law.

ment law cases filed in federal district courts increased 430%, from 4,331 in 1971 to 22,968 in 1991).

### C. THE JURY'S AWARD OF PENSION BENEFITS

BHA argues that it is entitled to judgment as a matter of law denying the jury's award of $30,306 in pension benefits. BHA raises three reasons for denying this award. The Court finds none of them persuasive.

### 1. After–Acquired Evidence Defense

BHA claims that judgment as a matter of law is warranted because "there is such a complete absence of evidence supporting the jury's finding regarding the Defendant's 'after-acquired evidence' defense that the jury's determination could only have been the result of sheer surmise and conjecture." (Def. Mem. re: Mot. for Judg. as Matter of Law ("Def.Mem.") at 10.) The record does not support this contention.

■ An employer can avoid front pay and other remedies by producing after-acquired evidence of an employee's wrongdoing, but only if it can establish that the "wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 360–63, 115 S.Ct. 879, 886–87, 130 L.Ed.2d 852 (1995).

■ BHA asserts that it satisfied this standard by offering unrebutted evidence of misconduct at trial. Rusnak admitted that, when he applied to BHA for the job of personnel administrator, he misrepresented the year he received his undergraduate degree. BHA also offered evidence that Rusnak made the same misrepresentation to Harbor during his interview.[16] The evidence further established that possession of a bachelor's degree was a requirement for the position. Because Rusnak had not yet earned his degree, he did not meet the job qualifications. BHA's executive director testified that he would have terminated Rusnak immediately upon learning of the misrepresentation.

16. Rusnak, however, testified that Harbor did not ask him about his undergraduate degree during the interview. (Tr. at 380.)

BHA claims the above evidence was so overwhelming that a reasonable jury could only have found for BHA on its after-acquired evidence defense. Therefore, Rusnak was not entitled to any pension benefits, and the jury's award must be denied as a matter of law. The record, however, contains sufficient evidence to lead a reasonable jury to reject the defense.

Rusnak testified that, although he did not yet have a degree at the time of his job application, he had completed almost all of the requisite credits for the degree (approximately 120 out of 132). Rusnak further testified that, as a general rule, two years of work experience are considered equal to one year of education. (Tr. at 228.) When Rusnak submitted his application to BHA, he had eight years of personnel experience at the management level and a few years of personnel experience below the management level.

Moreover, the evidence established that Rusnak performed his job well. Both Harbor and Craig awarded him high performance ratings for his work as personnel administrator. Additionally, Rusnak received a number of merit-based pay increases, ranging between three and five percent of his annual gross salary. Shortly before his termination, Rusnak received a four percent salary increase.

Craig apparently was so pleased with Rusnak's work that he made several efforts to convince Rusnak to continue working at BHA. When Rusnak decided to leave BHA for another job, Craig met with him to persuade him to stay. Craig then appeared before the board of commissioners to obtain approval of a $10,000 increase in Rusnak's salary. Rusnak testified that Craig also offered him future opportunities to serve as the personnel director and to head his own department.

Finally, Craig expressed some reservation when asked if, knowing of the misrepresentation, he would have agreed to employ Rusnak. He stated, in part:

> ... you depend on the managerial support team to be trustworthy ... and I just don't think that I would be able to feel that confident with him at this point; yet I

really felt that he was a person that we could have used in the authority.

(Tr. at 371.) Although Craig believed he would have terminated Rusnak immediately upon learning of the misrepresentation, he also admitted he had never encountered a situation where a job applicant had misrepresented his qualifications.

In sum, the record demonstrates that Rusnak came to BHA with ample experience in the personnel area; that he was just twelve credits short of earning his degree; that once at BHA, Rusnak's performance was highly regarded; that BHA took considerable steps to maintain Rusnak as an employee, including raising his salary by $10,000; and that the executive director exhibited some uncertainty as to the impact the misrepresentation would have had on Rusnak's employment. In light of this evidence, the Court cannot agree with BHA that the jury's rejection of the after-acquired evidence defense "could only have been the result of sheer surmise and conjecture." (Def. Mem. at 10.) Accordingly, BHA's motion for judgment as a matter of law on this ground is denied.

## 2. Jury's Rejection of Rusnak's Future Losses Claim

As a second basis for denying the pension benefits award, BHA relies on the jury's rejection of Rusnak's future losses claim. The jury awarded Rusnak zero dollars for future losses, with the comment, "He found work." At the same time, however, the jury awarded Rusnak $30,306 in pension benefits, a component of future losses. BHA seizes upon this discrepancy as grounds for judgment as a matter of law on the pension benefits award.

The evidence demonstrated that Rusnak was most recently employed through April 19, 1996 with a company called Sodexho. When first questioned about the reason for the termination of this employment, Rusnak told the jury that his position had been eliminated. Upon further questioning, Rusnak admitted that, in fact, he had been terminated because one of his supervisors did not want him to continue as a consultant. From this evidence, BHA surmises that "the only interpretation that can logically be given to

the jury's action in denying the Plaintiff damages for future losses is that they determined that Plaintiff had found work." (Def. Mem. at 14.) Because Rusnak lied to the jury about the reason for his dismissal, "it was reasonable for the jury to conclude that the Plaintiff lost this subsequent employment as a result of his own failings." (*Id.* at 15.)

BHA argues that these circumstances should preclude Rusnak from receiving an award of front pay or future losses. Because pension benefits are a component of future losses, they, too, should be denied. In other words, the Court should extrapolate from the jury's rejection of future losses to grant BHA judgment as a matter of law on the pension benefits award.

The Court finds no basis for manipulating the jury's award in this manner. The Second Circuit has held that, under the ADEA, the decision whether to award front pay is an equitable one entrusted to the court. *Dominic v. Consolidated Edison Co. of New York,* 822 F.2d 1249, 1257 (2d Cir. 1987). Likewise, the amount of front pay to be awarded is a decision that belongs to the court. *Id.* As a result, the jury's findings with respect to future losses and pension benefits are advisory, and the Court is free to accept or reject them, in whole or in part. *Downes v. Volkswagen of America, Inc.,* 41 F.3d 1132, 1141–42 (7th Cir.1994); *Price v. Marshall Erdman & Assocs., Inc.,* 966 F.2d 320, 324 (7th Cir.1992). Thus, the mere fact that the jury awarded zero future losses and $30,306 in pension benefits does not compel the Court to grant BHA judgment as a matter of law denying the pension benefits award.

However, BHA further argues that, as a matter of law, the Court should deny future pension benefits on the implied contract claim. The award of future damages on the implied contract claim is one entrusted to the trier of fact, the jury. In its motion, BHA essentially asks the Court to speculate as to the jury's rationale behind its rejection of Rusnak's future losses claim, and to use that rationale as grounds for denying the pension benefits award. The Court declines to do so.

It is not the Court's job to extrapolate in BHA's favor from the paucity of information contained in the special interrogatory answers. At a minimum, the answers demonstrate some degree of confusion on the part of the jury. In light of this confusion, the Court cannot, and will not, speculate as to the jury's rationale. Moreover, the jury's inclusion of the written comment, "He found work," far from clarifies the jury's intent. If anything, it only adds to the confusion. Under these circumstances, judgment as a matter of law is inappropriate.

### 3. Inconsistency in Jury's Denial of Future Losses and Award of Future Pension Benefits

BHA also argues that it is entitled to judgment as a matter of law on the pension benefits award due to "the inherent inconsistency between the jury's determination as to front pay and its determination as to future pension benefits." (Def. Mem. at 16.) The jury awarded Rusnak $30,306 in pension benefits he would have received had he remained employed at BHA until age sixty. Because pension benefits are an element of future damages,[17] this award is inconsistent with the jury's decision not to award any future losses.

BHA claims that where an inconsistency exists between the special verdict answers, the Court must adopt a view which makes the answers consistent and enter judgment accordingly. *Auwood v. Harry Brandt Booking Office, Inc.,* 850 F.2d 884, 891 (2d Cir.1988). If the Court is unable to harmonize the jury's answers, it must order a new trial. *Id.* However, as previously noted, the issue of front pay is entrusted to the Court's equitable discretion under the ADEA. *Dominic,* 822 F.2d at 1257–58. Indeed, BHA concedes that "the jury's determinations on the issues of future losses are only advisory to the trial court on the plaintiff's ADEA claim...." (Def. Mem. at 17.) Thus, under

---

17. *See Blum v. Witco Chem. Corp.,* 829 F.2d 367, 373–74 (3d Cir.1987) (awarding future damages in the form of lost pension benefits)

the ADEA, this Court is not required to reconcile the inconsistency in the jury's interrogatory answers by granting BHA judgment on the award of pension benefits.[18] *See Downes,* 41 F.3d at 1141 ("The court may submit the issue [of front pay] to the jury for advice, but it is not bound by the jury's advisory verdict.").

However, BHA also moves for judgment as a matter of law, denying the pension benefits award with respect to the implied contract claim. Here the jury's verdict is not advisory. Therefore, the Court must attempt to harmonize the inconsistent interrogatory answers. BHA claims that "[t]he only manner in which to harmonize the inconsistent answers ... is by entering judgment for the Defendant and denying the Plaintiff's claim for future losses in their entirety." (Def. Mem. at 17.)

Again, the Court refuses to manipulate the jury's answers in the manner that BHA requests. In the Court's view, the confused and contradictory nature of the answers renders them irreconcilable. The confusion is further enhanced by the jury's written comments. In these circumstances, the Court will not impose its own logic on the jury's answers to accommodate BHA's efforts to avoid the pension benefits award. Instead, the Court denies BHA's motion for judgment as a matter of law, and grants a new trial based on the irreconcilable inconsistency within the jury's special interrogatory answers.

## D. JURY'S FINDING THAT BHA FAILED TO ARTICULATE A LEGITIMATE, NONDISCRIMINATORY REASON FOR THE TERMINATION

In the alternative, BHA moves for a new trial because, in addition to the errors discussed above, the jury committed a serious error when it decided that BHA did not articulate a legitimate, nondiscriminatory reason for Rusnak's termination. The Court grants BHA's motion.

### 1. BHA's Burden of Production

In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court created a three-part, burden-shifting scheme for analyzing discrimination claims. The Court further refined this scheme in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and in *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093–94. If the plaintiff meets this burden, a presumption is created that the defendant unlawfully discriminated against the plaintiff. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094; *St. Mary's Honor Ctr.,* 509 U.S. at 506, 113 S.Ct. at 2746. At this point, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. *See also Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093; *St. Mary's Honor Ctr.,* 509 U.S. at 506–07, 113 S.Ct. at 2746–47. The defendant's burden is merely one of production, not persuasion. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. Therefore, the defendant does not have to prove the absence of discriminatory motive, but must offer some facially nondiscriminatory reason for its conduct. Nor is the defendant under any duty to prove that it was actually motivated by the proffered reason. *Id.* at 254, 101 S.Ct. at 1094. Instead, the defendant must merely "set forth, through the introduction of admissible evidence," a legitimate, nondiscriminatory reason for the plaintiff's termination. *Id.* at 255, 101 S.Ct. at 1094. "The explanation provided

---

**18.** The only case that BHA cites to support its argument, *Auwood v. Harry Brandt Booking Office, Inc.,* 850 F.2d 884 (2d Cir.1988), involved a non-advisory award of damages. The *Auwood* Court addressed the issue of inconsistent special interrogatory answers concerning damages in an action brought under the Sherman Act. Here the court's duty to harmonize the jury's answers rested on the parties' Seventh Amendment rights. *Id.* at 890–91.

must be legally sufficient to justify a judgment for the defendant." *Id.*

If the defendant cannot articulate a nondiscriminatory reason for the decision, the presumption of unlawful discrimination remains intact; and the plaintiff is entitled, as a matter of law, to judgment in its favor. *Id.* at 254, 101 S.Ct. at 1094. On the other hand, if the defendant satisfies its burden of production, the presumption is *rebutted* and thereby destroyed. As the Supreme Court stated in *St. Mary's Honor Ctr.*, the presumption "simply drops out of the picture." 509 U.S. at 511–12, 113 S.Ct. at 2749–50.

The plaintiff must then show, by a preponderance of the evidence, that he was a victim of intentional discrimination. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *St. Mary's Honor Ctr.,* 509 U.S. at 508, 511, 113 S.Ct. at 2747, 2749. Plaintiff "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

### 2. BHA's Evidence of a Legitimate, Nondiscriminatory Reason for the Termination

In this case, the jury found that Rusnak had established a prima facie case of retaliation under the ADEA. However, when asked in the special interrogatories if BHA had articulated a legitimate, nondiscriminatory reason for the termination, the jury answered in the negative. As a result, the presumption of unlawful retaliation remained intact, and the jury was required, as a matter of law, to find in favor of Rusnak.

■ The record does not support the jury's conclusion that BHA failed to proffer a legitimate, nondiscriminatory reason for Rusnak's termination. BHA offered ample evidence that it terminated Rusnak's position as a cost-saving measure because it was suffering a one-million-dollar budget deficit.

Three witnesses, including Rusnak's own rebuttal witness, testified in detail about BHA's budgetary problems. BHA's finance director testified at great length about the deficit BHA was facing at the time of Rusnak's termination. She explained that, in August and September of 1991, she discovered a deficit of one million dollars in BHA's budget. If not addressed, this deficit posed serious consequences to BHA, namely inclusion on HUD's "troubled housing list." In an effort to correct the imbalance, BHA took several measures, including eliminating Rusnak's position. Because BHA had operated without this position prior to 1989, BHA determined that it was the most appropriate position to abolish. Harbor further testified that the position has not been filled since Rusnak's termination; and that BHA has returned to the procedure followed before Rusnak was hired, delegating the responsibilities among several employees.

BHA's executive director also testified that Rusnak's termination was part of BHA's effort to reduce the deficit. He explained BHA's reluctance to eliminate the position until it proved absolutely necessary. In his words, the decision was "[s]trictly budgetary." (Tr. at 374.) Finally, Rusnak's own rebuttal witness, William Kinsella, testified about the deficit that arose in the 1991–1992 budget.

In addition to witness testimony, BHA submitted documentary evidence establishing the existence of a deficit in BHA's budget for the fiscal year ending September 30, 1992. (Joint Exh. 13 (budget for fiscal year 1991–1992); Joint Exh. 14 (year-end report for fiscal year ending September 30, 1992)).

### 3. Serious Nature of the Jury's Error

■ In reaching its decision, the jury either (1) overlooked the evidence of a legitimate, nondiscriminatory reason; or (2) considered the evidence and rejected it on the merits. Neither approach was proper. Whether the jury found the evidence persuasive was irrelevant at this stage of the proceedings. To satisfy its burden of production, BHA was only obliged to articulate a reason. It had no duty to establish the truth of that reason. In *St. Mary's Honor Ctr.,* the Supreme Court emphasized:

In the nature of things, the determination that a defendant has met its burden of production (and has thus rebutted any le-

gal presumption of intentional discrimination) can involve no credibility assessment. For the burden-of-production determination necessarily *precedes* the credibility-assessment stage.

509 U.S. at 509, 113 S.Ct. at 2748 (Emphasis in original)

Assuming that the jury did not simply overlook the evidence, it appears that the jury substituted the "credibility-assessment stage" for the "burden-of-production determination." In other words, the jury distorted the Supreme Court's burden-shifting scheme by first rejecting BHA's evidence on the merits, and then concluding that BHA had not articulated a legitimate, nondiscriminatory reason for the termination. This approach, and the decision that followed, were clearly erroneous.

The jury's error had serious implications on the outcome of this case. By virtue of its error, the jury was obliged to rule in Rusnak's favor as a matter of law. As a result, Rusnak prevailed without ever having to satisfy his burden of persuasion.

In contrast, if the jury had determined that BHA articulated a legitimate, nondiscriminatory reason for the termination, BHA would have found itself in a much better position. As the Supreme Court observed in *St. Mary's Honor Ctr.*, "By producing *evidence* (whether ultimately persuasive or not), of nondiscriminatory reasons, petitioners sustained their burden of production, and thus placed themselves in a 'better position than if they had remained silent.' " 509 U.S. at 509, 113 S.Ct. at 2748 (Emphasis in original). By meeting its burden of production, BHA would have destroyed the presumption of unlawful retaliation; and Rusnak would have been required to prove, by a preponderance of evidence, that the proffered reason was pretext for retaliation. Because of its error, however, the jury did not reach this critical question. The special verdict form instructed the jury to skip the question of pretext if it found that BHA did not meet its burden of production. Thus, the jury never proceeded to the "new level of specificity" called for when the defendant articulates a legitimate, nondiscriminatory reason. *Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094.

Because of the jury's serious error, and the unjust impact of that error on the verdict, the Court grants a new trial. A new trial is warranted on both the ADEA claim and the implied contract claim. Rusnak based his implied contract claim on the same allegations of retaliation that comprised his ADEA claim. In fact, he admitted that BHA could have terminated him for legitimate financial reasons without violating the implied contract. (Tr. at 232.) Therefore, it is reasonable to conclude that the jury's error with regard to the ADEA claim tainted its verdict concerning the implied contract claim.

### III. CONCLUSION

For the foregoing reasons, the Court DENIES Defendant's Motion for Judgment as a Matter of Law [Doc. No. 51] and GRANTS Defendant's Motion for a New Trial [Doc. No. 51].

SO ORDERED.