Carmen M. FERGUSON, Plaintiff,

v.

MICHAEL FOODS, INC.; Northern Star Company; M.G. Waldbaum; J.D. Clarkson; and Ron Bergman, Defendants.

No. 98–1386 (DSD/JMM).

United States District Court,
D. Minnesota.

Aug. 24, 1999.

John D. Thompson, Todd P. Zettler, Rider, Bennett, Egan & Arundel, Minneapolis, MN, for plaintiff.

Linda L. Holstein, Parsinen, Kaplan, Levy, Rosberg & Gotlieb, Minneapolis, MN, Geoffrey P. Jarpe, Jeffrey B. Stites, Maun and Simon, Minneapolis, MN, for defendants.

## ORDER

DOTY, District Judge.

This matter is before the court on (1) defendants' motion for summary judgment and (2) plaintiff's appeal of Magistrate Judge Mason's May 20, 1999 order denying plaintiff's motion to amend her complaint. Based on a review of the file, record, and proceedings herein, the court (1) grants in part and denies in part defendants' motion and (2) affirms the magistrate judge's order.

## BACKGROUND

In 1974, plaintiff Carmen Ferguson began working at defendant Northern Star Company, a food processing subsidiary of defendant Michael Foods, Inc. After working her way up the ranks at Northern Star, Ferguson became director of human resources in 1991, running a department that oversaw the human resource needs of well over 500 employees. By 1996, she was earning a salary of $62,140, with a bonus potential of 30 percent of base salary. The record evidence reflects that Northern Star was fully satisfied with her performance prior to the events at issue in this case.

In August 1995, J.D. Clarkson became president of Northern Star. Ferguson and other employees of Northern Star allege that Clarkson immediately made it known that he preferred not to have women playing important roles in the workplace. Ferguson also alleges that, early in Clarkson's tenure at Northern Star, he confided to her that he no longer fires people but instead makes them so miserable that they quit. Further, Ferguson asserts that Clarkson would, on occasion, make derogatory and lewd comments about women while he was at work.

In February 1996, Cathy Mensing, an employee working in Northern Star's Human Resources Department, submitted a letter complaining that she had been sexually harassed by executive vice president Tom Welna and company controller Max Hoffman. In response, the Michael Foods CEO Gregg Ostrander decided to conduct an internal investigation. Ostrander appointed Anita Darnell as lead investigator. Darnell, a former colleague of Clarkson, was human resources manager at Crystal Farms, another Michael Foods subsidiary. After completing her investigation, which Ferguson alleges was carried out in close consultation with Clarkson, Darnell recommended that Welna and Ferguson be removed from their jobs. In March 1996, Ferguson was displaced from her job at Northern Star and transferred to a human resources position at defendant M.G. Waldbaum, also a subsidiary of Michael Foods, where she began working under the supervision of defendant Ron Bergman, whom Ferguson had previously considered a corporate peer. Ferguson lost her 30 percent growth bonus and her seat on the corporate-wide human resources policy committee. Welna and Hoffman remained in their positions.

In November 1996, after Ferguson's transfer to Waldbaum, Occupational Safety and Health Administration ("OSHA") Inspector Don Voss visited Northern Star, responding to the complaint of an employee who had injured his hand while at work. Voss immediately noticed certain mathematical errors on the face of the company's OSHA logs and asked Northern Star officials to correct the problems by the following Monday. Clarkson called in Bergman to examine the logs. Rather than merely correcting the errors, however, Bergman conducted a complete audit, spending an entire week, with the assistance of four other employees, recreating the OSHA logs. Bergman concluded from his investigation that Ferguson, who had been in charge of completing the OSHA logs when she worked at Northern Star, had intentionally falsified the records. On December 2, 1996, Bergman met with Ferguson and asked her what explanation she had for the condition of the OSHA logs. When Ferguson asked for the opportunity to examine the logs herself, Bergman refused and, at the close of the meeting, asked for her elevator pass and key. The following day, Bergman called her on the phone and told her that she was fired. Two days later, Bergman gave Ferguson a document stating the official reason for her termination: the falsification of company records.

After Ferguson's termination, Bergman informed several executives at Michael Foods that Ferguson had falsified the OSHA logs. Thereafter, both Michael Foods CEO Ostrander and Bergman told Jeff Shapiro that Ferguson had falsified the OSHA records. Shapiro then contacted an insurance carrier and an insurance broker about the incident and its possible consequences with regard to insurance matters.

On May 11, 1998, Ferguson filed a complaint in federal court containing a number of counts, including sexual harassment, gender discrimination, and retaliation in violation of the Minnesota Human Rights Act ("MHRA") and Title VII of the Civil Rights Act, defamation, and tortious interference with employment contract. Defendants removed to federal court. After a period of discovery, defendants bring a motion for summary judgment. Ferguson appeals an order by Magistrate Judge Mason denying her motion to amend her complaint to assert a claim for punitive damages.

## DISCUSSION

### A. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment

as a matter of law." In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). A fact is material only when its resolution affects the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202. A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *See id.* at 252, 106 S.Ct. 2505.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. *See id.* at 250, 106 S.Ct. 2505. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. *See id.* at 322–23, 106 S.Ct. 2548.

### B. Title VII and MHRA Clams

In Counts I and II of her complaint, Ferguson brings identical sexual harassment, gender discrimination, and retaliation claims under Title VII and MHRA. Whether brought under Title VII or the MHRA, Ferguson's claims are subject to the same legal analysis. *See Sigurdson v. Isanti County*, 386 N.W.2d 715, 719 (Minn. 1986) (interpreting legal analysis for MHRA as equivalent to Title VII); *see also Hanenburg v. Principal Mut. Life Ins. Co.*, 118 F.3d 570, 574 (8th Cir.1997) (applying principles of Title VII to cases under MHRA "because of the substantial similarities between the two statutes"); *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 444 (Minn.1983) (analyzing

MHRA retaliation claim under *McDonnell Douglas* framework).

### 1. Sexual Harassment

To establish a sexually hostile work environment in violation of the Title VII, Ferguson must establish (1) that she belongs to a protected group; (2) that she was subject to unwelcome harassment; (3) that the harassment was based on her status as a member of a protected group; and (4) that the harassment affected a term, condition, or privilege of employment. *See, e.g., Phillips v. Taco Bell Corp.*, 156 F.3d 884, 888 n. 4 (8th Cir.1998). Harassment is actionable if it is " 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). The conduct in question "must be sufficient to create a hostile environment, both as it would be viewed objectively by a reasonable person and as it was actually viewed subjectively by the victim." *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 840 (8th Cir.1998) (citing *Harris*, 510 U.S. at 21–22, 114 S.Ct. 367); *see also Rorie v. United Parcel Service, Inc.*, 151 F.3d 757, 761 (8th Cir.1998). The court must examine the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. 367; *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998). "[S]imple teasing ... offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* Accordingly, " 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language ... and occasional teasing are

not actionable.'" *Wallin v. Minnesota Dept. of Corrections,* 153 F.3d 681, 688 (8th Cir.1998) (quoting *Faragher,* 118 S.Ct. at 2284).

■ Ferguson alleges that, while she worked at Northern Star, Clarkson winked suggestively at her, called her "his girl," and made several lewd comments about women who worked at the company. However, even assuming that these allegations are true, the court concludes that the behavior complained of is not sufficient to make out a hostile workplace claim. First, many of the comments of which she complains were not personally directed at Ferguson. *See Thompson v. Campbell,* 845 F.Supp. 665, 674 (D.Minn.1994). In fact, much of the evidence regarding Clarkson's workplace comments dates to a time after Ferguson had been transferred from Northern Star. Second, the alleged comments, while clearly inappropriate, were isolated and offhand in nature. *See Faragher,* 118 S.Ct. at 2283.

■ Ferguson's allegations of a hostile workplace at Waldbaum are even more attenuated. Ferguson contends that her supervisor, Ron Bergman, treated her unfairly by refusing her requests for vacation time and business cards and by placing excessive pressure on her to perform well in her job. However, Ferguson has failed to demonstrate that these incidents, in themselves, amounted to more than the ordinary tribulations every employee is occasionally forced to suffer in the course of his or her employment. *See id.* at 2284.

In short, Ferguson has failed to show the kind of severe and pervasive harassing conduct that might alter the terms and conditions of her employment, either at Northern Star or at Waldbaum. Accordingly, the court must grant defendants summary judgment on Ferguson's hostile workplace claims under Title VII and MHRA.

**2. Gender Discrimination**

■ Ferguson also claims intentional gender discrimination arising out of two events: her transfer from Northern Star to Waldbaum and her discharge from Waldbaum. To prevail on these gender discrimination claims, Ferguson must prove (1) that she is a member of the protected class; (2) that she met the applicable job qualifications; and (3) that she suffered an adverse employment decision, such as discharge or demotion, under circumstances giving rise to the inference of discrimination. *See, e.g., McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 510 (8th Cir.1995). Where the plaintiff offers circumstantial evidence to prove discrimination, the sequence and allocation of proof are governed by the Supreme Court decision in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800–06, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See also Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). As explained by the Eighth Circuit:

> At the first stage, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. The prima facie case, in the absence of an explanation from the employer, creates a presumption that the employer unlawfully discriminated against the employee. If the plaintiff establishes a prima facie case, the burden of production shifts at the second stage to the defendant, who must articulate some legitimate, nondiscriminatory reason for the adverse employment action. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted and "drops from the case." The burden then shifts back at the third and final stage to the plaintiff, who is given the opportunity to show that the employer's proffered reason was merely a pretext for discrimination. The plaintiff retains at all times the ultimate burden of persuading the trier of fact that the adverse employment action was motivated by intentional discrimination.

*Rothmeier,* 85 F.3d at 1332. If the analysis reaches this third stage, "the rule in [the Eighth] Circuit is that an [employment] discrimination plaintiff can avoid summary judgment only if the evidence considered in its entirety (1) creates a fact issue as to whether the employer's proffered reasons are pretextual and (2) creates a reasonable inference that [protected status] was a determinative factor in the adverse employment decision." *Id.* at 1336–37.

### a. Transfer from Northern Star to Waldbaum

Defendants contend that Ferguson's discriminatory transfer claim should be dismissed because it did not constitute an adverse employment action. As the Eighth Circuit stated in *Ledergerber v. Stangler,*

> [A] "purely lateral transfer that does not involve a demotion in form and substance, cannot rise to the level of a materially adverse employment action." A transfer involving only minor changes in working conditions and no reduction in pay or benefits will not constitute an adverse employment action, "[o]therwise every trivial personnel action that an irritable . . . employee did not like would form the basis of a discrimination suit."

122 F.3d 1142, 1144 (8th Cir.1997) (*quoting Williams v. Bristol–Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir., 1996)). This means that job actions which result merely in a "bruised ego" or "public humiliation" are not actionable under employment discrimination law. *Id.* At the same time, the *Ledergerber* court warned that "an employer cannot insulate itself from liability for discrimination merely by offering transfer at the same salary and benefits." *Id.* at 1144 n. 3. Rather, the ultimate question is whether the employment decision has "effectuated a material change in the terms and conditions of . . . employment." *Id.* at 1144. *See also Davis v. City of Sioux City,* 115 F.3d 1365, 1369 (8th Cir. 1997) (observing that the ultimate determination of adverse action is a fact question for the jury).

■ With these criteria in mind, the court concludes that Ferguson has introduced evidence creating a genuine fact issue as to whether her transfer to Waldbaum was a materially adverse employment decision. As Tom Welna, an executive vice president of Northern Star at the time of transfer, has testified, the sudden nature of Ferguson transfer into a previously nonexistent job at a different company under the supervision of a different Director of Human Resources had all the earmarks of a demotion. *See* Welna Depo., at 295–96. In her new position at Waldbaum, Ferguson lost (1) a 30 percent growth bonus available to her as an executive at Northern Star, (2) her position in the select group sitting atop the human resources hierarchy in the Michael Foods corporate family, and (3) direct supervisory contact with employees. Further, under her new supervisor Ron Bergman, whom Ferguson had earlier considered a peer, Ferguson was required to perform basic payroll and benefit enrollment functions, tasks which she had previously delegated to her own assistants. Taken together, a jury might reasonably infer from these circumstances that Ferguson's transfer adversely affected her present, and prospective, terms and conditions of employment at Michael Foods.

■ Defendants also argue that, even if Ferguson's transfer was an adverse job action, they had a legitimate, nondiscriminatory reason for removing Ferguson from her human resources position at Northern Star: an internal investigation by Anita Darnell had concluded that a significant number of Northern Star employees would not come to Ferguson with a human resources problem. However, as Ferguson has demonstrated, the data collected by Darnell during her investigation is ambiguous. While defendants claim that many of the twenty-five or so employees interviewed stated that they were uncomfortable about going to Ferguson with a complaint, Darnell's notes from her in-

vestigation suggest that the large majority of interviewees had no specific problems with Ferguson. In fact, the theme running through many of the interviews was that the employees were dissatisfied with Tom Welna, and that any discomfort with Ferguson flowed from her perceived close relationship with him. Yet, when Michael Foods acted in response to Darnell's investigation, it removed only Ferguson. Welna and Hoffman, the executives named as harassers in the complaint that had triggered Darnell's investigation in the first place, continued to remain in their jobs.

Based on these circumstances, and drawing all inferences in favor of the non-moving party, the court concludes that Ferguson has created a fact issue as to whether defendants' proffered reason for Ferguson's transfer was pretextual. Further, when this pretext evidence is examined in light of other evidence suggesting that Clarkson, a key decisionmaker at Northern Star, may have possessed a retrograde attitude toward women in the workplace,[1] the court believes that the question of discriminatory animus is best left for the jury.[2]

### b. Termination

■■■ With regard to Ferguson's discharge from her position at Waldbaum, defendants do not contest that Ferguson has met her prima facie case. Rather, defendants argue that her firing was motivated by a legitimate business reason, namely, her falsification of OSHA records. Again, however, the question of whether this proffered reason is merely a pretext for discriminatory conduct remains hotly

disputed. While the parties agree that there were a number of errors in the OSHA logs, the evidence is contradictory on (1) whether these errors tend to suggest falsification and (2) even if they do suggest falsification, whether Ferguson would have been the one responsible for it. As Bergman and other corporate officers have acknowledged, they can think of no motive for anyone, much less Carmen Ferguson, to falsify the OSHA logs.

Because defendants' assertion that Ferguson had falsified the OSHA records would appear to outpace the evidence supporting that assertion, the court concludes that Ferguson has demonstrated a genuine issue of fact as to pretext. Further, because a factfinder might reasonably conclude that defendants' stated reason for her termination was without merit, the court has no option but to deny summary judgment on the question of whether discriminatory animus is the real reason behind Ferguson's firing. *See Rothmeier,* 85 F.3d at 1336 (stating that "evidence that an employer's proffered nondiscriminatory explanation is wholly without merit or obviously contrived might serve [the] double duty" of "proving both pretext and discriminatory animus").

### 3. Retaliation

■■■ Separate from her harassment and discrimination claims, Ferguson claims that she was retaliated against in violation of Title VII and MHRA. To prevail on her retaliation claim, Ferguson must show (1) that she engaged in protected activity, (2) that defendants subsequently took an adverse employment action against her, and

1. Ferguson has also testified that Clarkson once told her that no longer fires people, he just makes their lives so miserable that they are forced to quit.

2. Defendants make the surprising argument that Northern Star, Ferguson's employer at the time of her transfer, must be dismissed from the suit even if the court finds that her discriminatory transfer claim is actionable. They contend that the decision to transfer Ferguson was ultimately made by Michael

Foods CEO Ostrander, not by anyone at Northern Star. However, it is undisputed that Northern Star president Clarkson assented to this decision by Ostrander, and there is also evidence that Clarkson played an active role in the investigation that resulted in the recommendation to transfer Ferguson. Based on these factors and the apparent overlap in the decisionmaking authority among executives at Michael Foods and its subsidiaries, the court concludes that Northern Star should remain a defendant in this suit.

(3) that the adverse action was causally linked to her protected activity. *See Cross v. Cleaver*, 142 F.3d 1059, 1071–72 (8th Cir.1998); *Manning v. Metropolitan Life Ins. Co.*, 127 F.3d 686, 692 (8th Cir.1997). The court concludes, however, that Ferguson has not established her prima facie case. First, Ferguson has not demonstrated that she engaged in protected activity prior to her transfer or discharge. Ferguson filed neither a formal discrimination complaint with a governmental agency nor an internal complaint at Northern Star or Waldbaum. Ferguson does allege that she voiced concern about Clarkson's behavior to Tom Welna and Max Hoffman, but there is no indication in the record that these remarks rose to the level of concrete objection or complaint that might be considered protected activity under the employment discrimination laws.

 Second, even if her comments to Welna and Hoffman were protected activity, Ferguson has introduced no evidence supporting the inference that there is a causal relationship between that activity and defendants' decision to transfer or fire her. Ferguson's remarks to Welna took place in November 1995 and she was not transferred until March 1996, a four-month gap that, as the Eighth Circuit has recently stated, "weakens the inference of retaliation that arises when a retaliatory act occurs shortly after a complaint." *Dhyne v. Meiners Thriftway, Inc.*, 184 F.3d 983 (8th Cir.1999) (*quoting Smith v. St. Louis Univ.*, 109 F.3d 1261, 1266 (8th Cir.1997)). Further, the record evidence contains no suggestion that Clarkson knew anything about her remarks or that Welna was anything less than an ally to Ferguson during her time at Northern Star. After reviewing the record evidence, therefore, the court determines that defendants' motion for summary judgment on Ferguson's retaliation claims should be granted.

## C. Defamation

 In Count III of the complaint, Ferguson asserts defamation claims against all defendants based on an unspecified number of communications to third parties. To prevail on her defamation claims, Ferguson must show that defendants published false and defamatory statements to someone other than the plaintiff. *See Richie v. Paramount Pictures Corp.*, 544 N.W.2d 21, 25 (Minn. 1996). Further,

> A claim for defamation "must be pled with a certain degree of specificity." While it is not necessary for the complaint to recite the exact language spoken, the plaintiff must identify who made the defamatory statement and what was said.

*French v. Eagle Nursing Home, Inc.*, 973 F.Supp. 870, 883 (D.Minn.1997) (citation omitted). Here, the complaint makes it clear that the defamatory communications complained of involve statements that Ferguson had falsified the OSHA logs. However, the only persons specifically identified in the complaint as making these statements are Ron Bergman and Jeff Shapiro. Accordingly, Ferguson's defamation claims must be narrowed to only those statements made by Bergman and Shapiro concerning her alleged falsification of company records.

 Defendants argue that even these potentially defamatory statements are not actionable because they are protected by qualified privilege. (*See Lewis v. Equitable Life Assurance Soc'y*, 389 N.W.2d 876, 889 (Minn.1986)). To be privileged, a statement must be made upon a proper occasion, for a proper purpose, and based upon reasonable or probable cause. *See id.; Wirig v. Kinney Shoe Corp.*, 461 N.W.2d 374, 379 (Minn.1990). While the existence of qualified privilege is ordinarily a question of law,

> where evidence of reasonable or probable grounds for believing in the validity of the potentially defamatory statements is such that it permits of more than one conclusion regarding the existence of reasonable and probable cause, the question becomes one of fact for the jury. The court then factors that factual finding into its legal determination of

whether an employer enjoys a qualified privilege for his statements.

461 N.W.2d at 380. Moreover, even when the criteria for qualified privilege are met, if the plaintiff proves the defamatory statement was made with malice, the privilege will not apply. *See Stuempges v. Parke, Davis & Co.,* 297 N.W.2d 252, 256–57 (Minn.1980).

■ In the present case, the evidence supports the conclusion that Bergman made his statements on a proper occasion and for a proper purpose, that is, to inform decisionmakers within the corporation that important workplace safety data may have been compromised. However, as suggested in Part B.2.b above, there is a genuine fact dispute as to whether Bergman had reasonable or probable grounds to believe that Ferguson had intentionally falsified the OSHA logs. Although it is not disputed that Bergman discovered a number of errors in the OSHA logs, it is not clear why, based on this evidence, he came to the conclusion that Ferguson had doctored the records intentionally. Accordingly, the court cannot summarily conclude that Bergman's statements were protected by qualified privilege. Further, even if the court ultimately determines that qualified privilege obtains, the circumstances surrounding Bergman's investigation and the conclusion he drew from it create a fact issue as to whether he acted with malice in making his statements about Ferguson.

■ With regard to Shapiro, the analysis is different. Shapiro made his statements about Ferguson only after he had been informed by both Bergman, an OSHA expert who had personally investigated the incident, and Gregg Ostrander, CEO at Michael Foods, that Ferguson had falsified OSHA documents. Based on these representations and pursuant to his risk management duties at Michael Foods, Shapiro informed certain insurance representatives about Ferguson's alleged conduct. Because the inaccuracy of the OSHA records directly impacted insurance coverage issues, there is no question that Shapiro spoke on the proper occasion and for the proper purpose. Further, because Shapiro could reasonably rely on the representations of Ostrander and Bergman, there is no factual dispute as to whether he spoke with reasonable or probable cause.

This case presents a fundamentally different scenario than *Wirig,* a case Ferguson relies heavily on. In *Wirig,* the Minnesota Supreme Court held that qualified privilege did not attach to the statements of a manager who relied on the hearsay statements of unknown or dubious sources without inquiring further himself. Here, Shapiro relied not on hearsay statements, but on information provided directly to him by Ostrander, his company's CEO, and Bergman, the person who had personally conducted the investigation. Under these undisputed circumstances, the court concludes, as a matter of law, that Shapiro's statements were made on probable cause and thus protected by qualified privilege. Likewise, the record evidence leaves no room for the conclusion that Shapiro acted with malice when making his statements about Ferguson. Accordingly, only those allegedly defamatory statements made by defendant Bergman to others within the company remain actionable.

**D. Tortious Interference**

■ Finally, Ferguson brings a claim for tortious interference with contract against the individual defendants Clarkson and Bergman. Under Minnesota law, "a third party who interferes with and causes the breach of a contract may be held liable for damages." *Kallok v. Medtronic, Inc.,* 573 N.W.2d 356, 361 (Minn. 1998). This is so even where the relationship at issue is one for employment-at-will. See *Nordling v. Northern States Power Co.,* 478 N.W.2d 498, 505 (Minn.1991). A cause of action for tortious interference with a contractual relationship requires proof of the following five elements: 1) the existence of a contract; 2) the alleged wrongdoer's knowledge of the contract; 3)

intentional procurement of its breach; 4) without justification; and 5) damages. *See Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn.1994).

The general rule is that a corporate officer or agent cannot interfere with a contract that his company has entered into. *Nordling*, 478 N.W.2d at 505; *Bouten v. Richard Miller Homes, Inc.*, 321 N.W.2d 895, 900–01 (Minn.1982). The reason for this rule is that "[i]f a corporation's officer or agent acting pursuant to his company duties terminates or causes to be terminated an employee, the actions are those of the corporation; the employee's dispute is with the company employer for breach of contract, not the agent individually for a tort." *Nordling*, 478 N.W.2d at 505. Nonetheless, a corporate officer may be liable for tortious interference with contract if the acts are outside the scope of the officer's duties. *See Nordling*, 478 N.W.2d at 506. The critical factor in determining if a corporate officer has acted outside the officer's duties is the presence of malice or bad faith, ill-will, spite, hostility, or a deliberate intent to harm the plaintiff. *See id.* at 507.

Defendants argue that Ferguson's tortious interference claim is preempted by the MHRA under the reasoning of *Humenansky v. Board of Regents*, 1998 WL 436879 at *3 (Minn.Ct. App. Aug.4, 1998) (unpublished) (holding that MHRA claims preclude breach-of-contract claim based on the same factual elements and same injury). The court disagrees. Because the conduct prohibited under MHRA does not necessarily equate with individual conduct actionable under a tortious interference theory, MHRA cannot be considered automatically preemptive of Ferguson's tortious interference claim. Tortious interference by a corporate officer requires unjustified and malicious interference with an employment relationship, a potentially different concept than status-based discriminatory intent. In other words, it is entirely possible for a person to act maliciously without being motivated by the discriminatory animus prohibited by the employment laws.

With these principles in mind, the court concludes that the dismissal of Ferguson's tortious interference claims against Clarkson and Bergman would be inappropriate. As discussed above, Ferguson has introduced considerable evidence that the stated reasons for Ferguson's transfer and termination may have been pretextual. While this pretext evidence provides a basis for the inference of intentional gender discrimination, it also provides a basis for the inference of some other form of malice or ill will. Further, Ferguson has shown that Clarkson and Bergman may have played a triggering role in these events. Viewing all the evidence in the light most favorable to Ferguson, then, the court concludes that a genuine fact issue exists as to whether Clarkson and Bergman maliciously interfered with Ferguson's employment relationship.

## E. Appeal of Magistrate Judge's Order

Finally, Ferguson has filed an appeal of Magistrate Judge Mason's May 20, 1999 order denying plaintiff's second motion to amend her complaint to add punitive damages. Ferguson contends that the magistrate judge erred when he construed Ferguson's second motion to amend as a motion for reconsideration subject to the "compelling circumstances" standard of Local Rule 7.1(g). However, the magistrate judge has already carefully explained the rationale behind his decision:

[M]ost of the substantive material upon which Plaintiff relies on the merits of her Motion to Amend was available at the time of the hearing on her first Motion seeking punitive damages, although some of the documentation is also contained in transcripts of depositions obtained thereafter. Plaintiff correctly observes that 'there is no bright line limit' on the number of times a party may make a motion to amend, for summary judgment or to compel discov-

ery. But it is also correct that once the Court has ruled on a Motion to Compel, for example, it would be the rare cased where a party would be permitted to make the same Motion to Compel the same discovery as the Court has already ruled upon. In any event, any party desiring to do so would be required to meet the procedural and substantive requirements of Local Rule 7.1(g), which Plaintiff has failed to do in this case. *Ferguson v. Michael Foods, Inc.*, Civil No. 98–1386 (DSD/JMM), Order at 3–4 (D.Minn. May 20, 1999). The court fully agrees with this analysis.[3] Accordingly, because the magistrate judge's order was neither clearly erroneous nor contrary to law, the court will affirm the May 20, 1999 order.

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Defendants' motion for summary judgment is granted in part and denied in part:

    a. Plaintiff's sexual harassment and retaliation claims under MHRA and Title VII are dismissed with prejudice.

    b. Plaintiff's defamation claims are dismissed with prejudice except for those claims arising out of Ron Bergman's statements to others concerning plaintiff's alleged falsification of company records.

    c. Plaintiff's discriminatory transfer and discriminatory discharge claims under MHRA and Title VII remain viable.

    d. Plaintiff's tortious interference claims remain viable.

2. Magistrate Judge Mason's order dated May 20, 1999 is affirmed in its entirety.

## ORDER

This matter is before the Court on Plaintiff's Motion to Amend Complaint to Assert Claim for Punitive Damages [Dock-

et Nos. 42, 43]. Appearances were as follows: Todd Zettler, Esq. for Plaintiff; Jeffrey Seits, Esq. for Defendants Michael Foods, Waldbaum and Bergman; Linda Holstein, Esq. for Defendants Northern Star Co. and J.D. Clarkson.

The Court, being duly advised in the premises, upon all of the files, records and proceedings herein, now makes and enters the following Order.

IT IS HEREBY ORDERED that Plaintiff's Motion to Amend Complaint to Assert Claim for Punitive Damages [Docket Nos. 42, 43] is denied.

## MEMORANDUM

The parties agree that Plaintiff may seek to recover the punitive damages permitted by statute under Title VII and the Minnesota Human Rights Act without any amendment to the pleadings. The issue before the Court is whether punitive damages may be sought pursuant to the separate Minnesota Statutes permitting such an award.

The issue was previously before the Court in connection with another Motion by Plaintiff, denominated Motion to Compel Discovery, Amend Scheduling Order, and for Protective Order [Docket No. 28]. The relief requested by that Motion included a prayer that Plaintiff be permitted to Amend to assert a claim for punitive damages. By Order dated March 18, 1999, this Court denied the Motion, on the ground that Plaintiff had failed to meet the standards required by Minn.Stat. §§ 549.191 and 549.20. [Docket No. 41].

On April 1, 1999 Plaintiff again moved to Amend, to seek punitive damages. [Docket No. 42 and 43]. At oral argument, the Court permitted the parties to submit supplemental Memoranda addressing the question of whether the Motion to Amend was properly before the Court. We now conclude that the Motion must be denied

---

3. However, the court does not read the magistrate judge's order to foreclose plaintiff from attempting to request punitive damages in connection with her statutory gender discrimination claims.

because the Court has already ruled upon the issue, and Plaintiff has not demonstrated that the issue should be reconsidered.

Motions to Reconsider are governed by the provisions of Local Rule 7.1(g) which provides as follows:

"Motions to reconsider are prohibited except by express permission of the Court, which will be granted only upon a showing of compelling circumstances, Requests to make such a motion, and responses to such requests, shall be made by letter to the Court of no more than two pages in length, a copy of which must be sent to opposing counsel."

Local Rule 7.1(g).

The Rule imposes procedural and substantive requirements. Procedurally, it requires that permission be obtained from the Court before presenting Motions to Reconsider. This reflects the expectation that such Motions are not to be made as a matter of course. The judicial process would be unduly expensive and time consuming if Courts were to be called upon to revisit each of their decisions. Instead, each party must fully support its arguments for and against a Motion the first time it is made, and Courts must then thoroughly review and rule upon the issues presented. Plaintiff id not seek leave of Court to make a Motion to Reconsider the decision denying the Motion to Amend, and the Motion is denied for this procedural reason.

Plaintiff also does not meet the substantive requirements of Rule 7.1(g). In order to obtain the "express permission of the Court" required by that Rule, a party is required to make "a showing of compelling circumstances" which would warrant a Motion to Reconsider. This showing is absent here. Plaintiff now submits extensive materials on the merits of the Motion seeking punitive damages, where before her submission was modest. The judicial process cannot tolerate a procedure by which a party is permitted to attempt a light effort once, and then follow with a more serious effort if the first effort fails.

See *U.S. West Financial Services, Inc. v. Buhler, Inc.*, 150 F.3d 929, 935 (8th Cir. 1998).

Finally, most of the substantive material upon which Plaintiff relies on the merits of her Motion to Amend was available at the time of the hearing on her first Motion seeking punitive damages, although some of the documentation is also contained in transcripts of depositions obtained thereafter. Plaintiff correctly observes that "there is no bright line limit" on the number of times a party may make a motion to amend, for summary judgment or to compel discovery. But it is also correct that once the Court has ruled on a Motion to Compel, for example, it would be the rare case where a party would be permitted to make the same Motion to compel the same discovery as the Court had already ruled upon. In any event, any party desiring to do so would be required to meet the procedural and substantive requirements of Local Rule 7.1(g), which Plaintiff has failed to do in this case.

May 20, 1999.