**Michael N. WILLIAMS, Plaintiff–Appellant,**

v.

**BRISTOL–MYERS SQUIBB COMPANY, Defendant–Appellee.**

No. 95–3649.

United States Court of Appeals, Seventh Circuit.

Argued April 17, 1996.

Decided May 29, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied June 26, 1996.

Dennis M. White, Edward A. Corcoran, Brennan, Steil, Basting & MacDougall, Madison, WI, for Plaintiff–Appellant.

James R. Clark, Anita M. Sorensen, Foley & Lardner, Madison, WI, for Defendant–Appellee.

**272**

Before POSNER, Chief Judge, and CUMMINGS and COFFEY, Circuit Judges.

POSNER, Chief Judge.

Michael Williams brought suit under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.*, against his former employer Bristol–Myers Squibb, the pharmaceutical manufacturer. He charged Bristol–Myers both with discriminating against him on account of his age (late 40s when the acts of alleged discrimination took place) and with retaliating against him for filing charges of discrimination with the EEOC and for giving a deposition in an age discrimination suit brought by a coworker. 29 U.S.C. § 623(d). The district judge granted summary judgment for the defendant after a thorough combing of the evidence of discrimination and retaliation obtained by Williams in pretrial discovery. That evidence, construed as favorably to Williams as reason and the record permit (the proper approach in evaluating a grant of summary judgment), can be summarized as follows:

Williams had worked for many years for the defendant and one of its predecessor companies, E.R. Squibb, in southern Wisconsin as a "detail man," calling on physicians and trying to persuade them to prescribe drugs manufactured by his employer. The trouble started in the late 1980s when James Dicks, Williams's supervisor, fired another salesperson, Trudy Lantow. She filed an age discrimination suit in which Williams was deposed. Shortly before he was disposed Dicks told him that he would be accountable for everything in it, a comment that Williams interpreted as a threat. Nevertheless Williams testified in his deposition in Lantow's case that Dicks was rough on the older sales reps and had told Williams that young people could be hired to do Williams's job for a lot less pay. The deposition was given in 1990, and Dicks, in his annual review of Williams's performance, wrote that "Mike has not been understanding, considerate or supportive of management in 1990." Dicks gave him a high rating in 1991 but a much lower rating and a much smaller raise the following year, and placed the only other sales rep who testified in Lantow's case on a disciplinary "performance improvement pro-

gram." Williams complained in a phone call to a superior of Dicks that the company was not being fair to some of the older sales reps. Dicks was heard to say he was not pleased about the phone call.

Late the same year (1992), Bristol–Myers decided to reorganize its sales force and reduce the number of salespersons. With the aid of a consulting firm it redrew territorial boundaries and fired a large number of sales reps in the Squibb division. Williams was not fired. His territory was split up but he was given a similar territory, promoting similar drugs to mostly the same doctors whom he had called on for Squibb, but drugs manufactured by the defendant's Mead Johnson division. He protested the transfer, complaining that it would take time for him to build up to the same sales level that he had reached in his previous job; and indeed his commission income, which in his last year at Squibb had amounted to 10.7 percent of his total earnings, fell precipitately in 1993. One of the defendant's sales directors said to Williams, "So, you're kicked out of one company and now you're going to get kicked out of another one, cause trouble in another one," and asked him why he didn't retire since he had lots of money. A regional sales manager at Mead Johnson was told by his counterpart at Squibb that Williams was a "management challenge."

John Voss, Williams's new supervisor (corresponding to Dicks at Squibb), wrote of Williams: "Older rep. Set in his ways. Works, but does things differently. Be a long process to change things." Voss put Williams into a "district coaching program." This required Williams to make special weekly reports and special written sales presentations, even though he had had only a short time to familiarize himself with his new job and it was customary not to put a salesman into such a program until he had been in his new job for at least eight months. Williams was told in writing that "failure to show improvement at any time during the program or in the immediate months after the program may lead to *further* disciplinary action" (emphasis added), implying, contrary to the defendant's characterization, that the "coaching" program was disciplinary in nature.

In August of 1993 Williams filed a charge with the EEOC, complaining that his transfer to the Mead Johnson division had been due to his age (47). And in October he amended the charge to add that his employer had retaliated against him for his having assisted Lantow with her age-discrimination suit. He was fired in January of the following year, ostensibly for reasons unrelated to his age or performance or to his assistance to Lantow. Federal law requires a maker of prescription drugs to have a samples control program designed to prevent its salesmen, who frequently give free samples to the physicians they call on, from distributing prescription drugs outside authorized channels. And the manufacturers have their own interest in making sure their salesmen don't steal samples either for their own consumption or for resale. One of the requirements of Bristol–Myers' code of conduct, designed to implement the samples control program, is that the receipt of a sample be acknowledged on a card signed by the physician whose name appears on the card. Pursuant to this policy, a salesman who wants to leave a sample with a physician writes the physician's name on a card, the physician signs it, and the salesman takes it back to the company, which has a file of physicians' signatures that it can use to verify the signature on the card. The salesman does not have to witness the physician's signature, however. He can give the card to the nurse and ask her to obtain the physician's signature and return the card to him. And one physician in a group practice can sign for the whole practice.

The company's code of conduct provides that "any employee who is found to have committed a serious violation [of the code] or multiple violations will be subject to termination at the sole discretion of the Company." Examples of serious violations are given, including "falsification of any Company document." The code explains that "falsification ... includes, but is not limited to ... knowingly accepting a signature on a Call Form or Service Order Form of anyone other than a licensed medical practitioner, or reporting a visit which has not been made."

As part of a routine review of samples cards, Voss found two cards for a Dr. Tim Donovan which Williams had submitted. The cards had the same date as well as name but the signatures were different. One was Donovan's; no one knows whose the other was. Voss also discovered that Williams had given a card with Dr. Jane Fossum's name on it to a partner of Fossum's, who in Williams's presence had signed the card "J. Fossum, M.D." and had assured Williams that this was okay. On the basis of these two incidents Williams was fired, although there is no suggestion that any samples were misapplied. So far as appears, Dr. Donovan and Dr. Fossum duly received the samples recorded on their cards; only someone other than Donovan—possibly another doctor (possibly his brother, Dr. Tom Donovan)—signed one of the Donovan cards, and Fossum's partner signed Fossum's card. Bristol–Myers argues that Williams was guilty of "falsification" within the meaning of the code. It points to several instances in which younger sales reps were fired for falsification. But in those cases the reps had forged physicians' names on the samples cards, or written up a visit that they had never made, or changed dates, or otherwise made a material false statement.

■ The suit complains about Williams's transfer from the Squibb division to the Mead Johnson division and about his being fired on purported grounds of "falsification." We do not think the transfer (or the placement of Williams in the "coaching" program) rises to the level of a materially adverse employment action. That is a threshold requirement of proving a violation of the age discrimination law because, so far as bears on this case, the law forbids only "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment," 29 U.S.C. § 623(a)(1), or "limit[ing], segregat[ing], or classify[ing] ... employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee." § 623(a)(2). The question whether a change in an employee's job or working conditions is materially adverse, rather than essentially neutral, is one of fact, as assumed in *Dahm v. Flynn*, 60 F.3d 253, 257 (7th Cir.1994), and

so can be resolved on summary judgment only if the question is not fairly contestable.

■ The transfer of Williams between divisions was strictly lateral—not a demotion—and while it did require Williams to learn new products, he acknowledges that there is so much innovation in the pharmaceutical industry that had he remained in the Squibb division he undoubtedly would have had to learn new products as well. He had to learn *more* new products in his new job, and this was likely to depress his sales initially and hence the commission component of his earnings, and did so. But any *involuntary* transfer, almost by definition, is likely to mean more work, and for a commissioned salesman initially less pay, for the employee who is transferred.

■ Obviously a *purely* lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either. *Flaherty v. Gas Research Institute*, 31 F.3d 451, 456–57 (7th Cir.1994); *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132 (7th Cir. 1993); *Spring v. Sheboygan Area School District*, 865 F.2d 883 (7th Cir.1989). Otherwise every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit. The Equal Employment Opportunity Commission, already staggering under an avalanche of filings too heavy for it to cope with, would be crushed, and serious complaints would be lost among the trivial. In .our very recent *McDonnell v. Cisneros*, 84 F.3d 256 (7th Cir.1996), the material adverseness of the transfer was conceded. In *Collins v. Illinois*, 830 F.2d 692, 704 (7th Cir. 1987), the lateral transfer was really a demotion; the plaintiff lost her office and her professional listing as a library consultant. In *Dahm v. Flynn, supra,* 60 F.3d at 257, the plaintiff's job underwent "a dramatic downward shift in skill level." In *Goss v. Exxon Office Systems Co.*, 747 F.2d 885 (3d Cir.1984), the case factually most like this one, a saleswoman was shifted to an inferior territory, and the court found a constructive discharge. The only issue, however, was whether the plaintiff *had* been constructively discharged, which if so would obviously be a materially adverse employment action. The action that precipitates a constructive discharge, while it must be sufficiently harmful or offensive to make a reasonable employee consider remaining in the job impossible, need not itself be a materially adverse employment action, or indeed an employment action of any kind. If your supervisor tells you that he'll shoot you unless you resign "voluntarily," and you do, that's constructive discharge, though the threat itself is not an employment action of any sort. Williams does not argue that the transfer and the assignment to the "punitive" coaching program amounted to a constructive discharge—and how could he? He didn't quit.

■ Williams is left with arguing that the indirect effect of the transfer on his commission earnings constituted a materially adverse employment action. A cut in base pay not offset by an increase in some other form of compensation would be a demotion, and hence a materially adverse employment action. Cf. *Crady v. Liberty Nat'l Bank & Trust Co., supra,* 993 F.2d at 136. So would be a cut in the commission *rate* (subject to the same qualification about offsets). But since commission earnings are proportional to sales, a transfer that has the effect of reducing the employee's sales and hence commissions is an unlikely candidate for discrimination, since the employer in such a case is hurting the employee by hurting itself, that is, by reducing its sales.

■ Although the question is close, we conclude that an indirect and minor effect on commission income (minor here because commission income was only a small fraction of the employee's total income) is not sufficient to transform a lateral transfer into a demotion. To treat Williams's transfer as a materially adverse employment action would bring virtually every lateral transfer within the reach of the age discrimination law (and other federal employment discrimination laws), which the courts thus far have refused to do.

So the claim based on the transfer and the coaching program goes nowhere but we have a different reaction to Williams's termination, which the word "pretextual" might have been coined to describe. The company might have argued that it fired Williams because it didn't like the color of his eyes. The age discrimination law does not forbid arbitrary discharges, only discharges based directly or indirectly (as in a case of retaliation) on age. Instead the company argued that it fired Williams because he engaged in "falsification" within the meaning of the code and because it had fired other, younger falsifiers. The code is not easily read to support the company's interpretation. The provision that we quoted defining falsification merely requires, so far as bears on Williams's offenses, that the samples card be signed by a licensed medical practitioner. We have no reason to suppose that either Donovan card was not signed by a physician or other licensed medical practitioner; and we know that a physician signed Fossum's card. Williams did violate the provision of the code that requires that the name and signature on the card match, and we suppose that two violations (one Donovan card plus the Fossum card) could be thought "multiple." But he was not fired for multiple violations of provisions of the code other than that forbidding falsification of company documents; he was fired for falsification. The company explains that failing to match the name and the signature is a species of falsification, and reminds us that the definition of falsification is open-ended ("not limited to"). But it would be a very curious form of draftsmanship for the drafters, having defined falsification, to bury a further example of it, without cross-reference and without characterization as falsification, elsewhere in the code. Nor is "falsification" an entirely apt description for failing to catch an unauthorized signature by someone else. And the company's insistence that Williams did just what the other employees fired for falsification did is so perverse as to cast additional doubt on its good faith.

Assuming the code did not create a contract between Bristol–Myers and him, which is not alleged, he cannot complain about the company's misinterpretation as such. But misinterpretation can be evidence of pretext. Against a background rich with suggestion though no conclusive proof that the company was out to get Williams because he was "old" (at least by salesmen's standards) and set in his ways and had complained about age discrimination against himself and others and had assisted another employee's age discrimination suit and had just filed not one but two charges of age discrimination with the government on his own behalf against Bristol–Myers, the company's unpersuasive interpretation of its code and equally unpersuasive comparison of Williams's offenses to those of the younger people whom it fired cry pretext, creating a triable issue of retaliation.

From what we have said it should be plain that Williams's discharge may have been due in part to his age, as well as to his complaints about discrimination. Either way, the discharge would be actionable under the age discrimination law.

The judgment for the defendant is affirmed so far as the transfer and coaching program is concerned but is reversed, and the case remanded for trial, with regard to the plaintiff's discharge.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.