[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
Pursuant to Rule 59 of the Rhode Island Superior Court Rules of Civil Procedure, the plaintiff, Adrienne Evans ("Evans" or "Plaintiff"), has moved for a new trial on her claims of disability discrimination and retaliation following a jury verdict in favor of the defendants, the Rhode Island Department of Business Regulation ("DBR") and Alfonso Mastrostefano ("Mastrostefano") (collectively "Defendants"). Defendants have filed a timely objection thereto. Additionally, Defendants have moved to renew their motions for judgment as a matter of law on all counts — disability discrimination, retaliation, gender discrimination, and hostile work environment — pursuant to Rule 50 of the Rhode Island Superior Court Rules of Civil Procedure.
 Facts and Travel
In the spring of 2001, Evans filed the instant action alleging numerous acts of discrimination. Among these claims were allegations of gender and disability discrimination, retaliatory conduct, and hostile work environment. Each of these claims is based in whole or in part on Defendants' decision to relocate Plaintiff from an office to a cubicle. According to Evans, an illegitimate motive for the transfer is demonstrated by the fact that three offices became vacant, yet Evans remained stationed in a cubicle. To this day, an office remains unoccupied at DBR. Currently, Evans sits at a desk without cubicle-partitions. Evans claims that these placement decisions were motivated by the fact that Plaintiff is a woman, Plaintiff suffers from a disability, and/or Plaintiff filed a charge of discrimination with the Department of Human Services ("DHS").
Plaintiff also asserts that she was subject to gender discrimination and a hostile work environment evinced by several sexually charged comments made by her superior, Mastrostefano. In further support of these claims, Plaintiff contends that Defendants established a monitoring system to which she alone was subjected, whereas the other males in her office were not monitored.
During trial, Plaintiff called numerous witnesses to testify on her behalf. At the close of Plaintiff's case, Defendants moved for judgment as a matter of law. This Court reserved decision on that motion. Thereafter, Defendants presented their case and, at the close of evidence, moved for judgment as a matter of law. This Court again reserved decision on that motion. After two days of deliberation, the jury returned a verdict for Defendants on all counts.
Subsequently, Plaintiff and Defendants made the above-mentioned motions and objections respectively.
 Liability under RICRA
Defendant Mastrostefano contends that he is not subject to personal liability under the Rhode Island Civil Rights Act of 1990 ("RICRA"), G.L. 1956 § 42-112-1 et seq. Although the statute does not expressly indicate from whom a plaintiff may recover, in Ward v. City of PawtucketPolice Dept., 639 A.2d 1379 (R.I. 1994), our Supreme Court states that the statute must be read broadly. Specifically, the statute states:
 "(a) All persons within the state, regardless of race, color, religion, sex, disability, age, or country of ancestral origin, have, except as is otherwise provided or permitted by law, the same rights to make and enforce contracts, to inherit, purchase, to lease, sell, hold, and convey real and personal property, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, and are subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." G.L. 1956 § 42-112-1.
The statutory language implies "that if individuals discriminate in ways that violate the statute, then they must be liable under it." Iacampo v.Hasbro, Inc., 929 F. Supp. 562, 573 (D.R.I. 1996) (holding supervisors individually liable under the RICRA). Therefore, individual liability under RICRA can be inferred from its broad language.
In Iacampo, the court found Title VII and the Americans with Disabilities Act ("ADA") imposed individual liability on supervisors. In explanation thereof, the Iacampo Court stated:
 "the imposition of individual liability on supervisory employees under Title VII and the ADA promotes judicial restraint while providing greater redress for victims of discrimination. . . . Moreover, threatening supervisory employees with individual liability under Title VII and the ADA deters those who would use their positions and power to discriminate, and guarantees that victims of discrimination will receive redress not only from amorphous corporate entities, but from their very present oppressors." Id. at 572.
This reasoning may also be applied to RICRA claims. RICRA must also guarantee redress for victims of discrimination from those who improperly use their power in the workplace to discriminate. Accordingly, Mastrostefano may be individually liable for conduct constituting a violation under RICRA.
DBR also asserts that it, as a state agency, is immune from suit under RICRA. In support thereof, DBR relies on the language of the statute to demonstrate that it does not expressly, or by necessary implication, waive sovereign immunity. In order to waive the protections afforded to the state under sovereign immunity, the legislature must clearly express that intention within the language of the statute. Andrade v. State,448 A.2d 1293, 1295 (R.I. 1982). Absent express statutory language, waiver of sovereign immunity must arise by necessary implication. Id.
With regard to waiver of sovereign immunity, the Rhode Island Supreme Court stated in Pellegrino v. R.I. Ethics Comm'n., 788 A.2d 1119 (R.I. 2002):
 "Because the existence of a right to receive government-employment benefits implies the existence of an appropriate remedy for recovering these benefits, we hold that the . . . statute contains an implicit waiver of sovereign immunity. And because the Legislature is presumed to know the state of existing relevant law when it enacts a statute, the General Assembly must be deemed to have known that, upon passing legislation providing for compensation to be paid to commission members for attending meetings, it was providing this compensation as an incident to the public offices they held and that their legal right to enforce the payment thereof accompanied their legal title to their offices." Pellegrino, 788 A.2d at 1124.
Similarly, RICRA provides "broad protection against all forms of discrimination in all phases of employment . . ., a public policy that the Legislature considered to be of major importance." Folan v.State/Department of Children, Youth, Families, 723 A.2d 287, 290-291 (R.I. 1999).[1] Accordingly, the Legislature sought to protect its constituents from discriminatory practices by all employers. One major employer in the State of Rhode Island is the State itself. By necessary implication, the State of Rhode Island, like any employer, is accountable to its employees for discriminatory conduct.
In addition, RICRA's protection is not limited to employment discrimination situations. The statute provides for redress where taxes and/or penalties are imposed for a discriminatory purpose. G.L. 1956 §42-112-1(a). As in Pellegrino, this statute would be rendered nugatory without the waiver of sovereign immunity. One of the purposes of the statute is to create accountability for taxes imposed for discriminatory reasons; by applying sovereign immunity, the fundamental public policy contemplated by the statute would be eviscerated. Accordingly, to effectuate the statute, sovereign immunity is waived by necessary implication.
 Liability under FEPA
Mastrostefano asserts that he is not liable for discriminatory conduct under the Fair Employment Practices Act ("FEPA"), G.L. 1956 § 28-5-1 et seq., because he does not qualify as an employer. He contends that he is not liable in either his individual or his official capacity. Alternatively, he asserts that the statute shields him from liability in his individual capacity.
Rhode Island General Laws 1956 § 28-5-7, states:
 "it shall be an unlawful employment practice: (1) for any employer: (i) to refuse to hire any applicant for employment because of his or her race or color, religion, sex, disability, age, sexual orientation, or country of ancestral origin, or (ii) Because of such reasons, to discharge an employee or discriminate against him or her with respect to hire, tenure, compensation, terms, conditions or privileges of employment, or any other matter directly or indirectly related to employment. . . ."
The protections created under FEPA are broad; specifically, these protections reach further to encompass individuals not qualifying as employers. Section 28-5-7(6) states it shall be unlawful
 "[f]or any person, whether or not an employer, employment agency, labor organization, or employee, to aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful employment practice, or to obstruct or prevent any person from complying with the provisions of this chapter or any order issued pursuant to this chapter, or to attempt directly or indirectly to commit any act declared by this section to be an unlawful employment practice."
Again, in Iacampo, 929 F. Supp. at 571, the United States District Court for the District of Rhode Island held that FEPA establishes individual liability for supervisors. The Iacampo Court applied the reasoning by which the court attached individual liability to RICRA claims to attach individually liability to FEPA claims. Id. Accordingly, Mastrostefano is personally liable for conduct amounting to FEPA violations. Id.
 Rule 59
Rule 59 provides in pertinent part:
 "A new trial may be granted to all or any of the parties and on all or part of the issues, in an action in which there has been a trial by jury for error of law occurring at the trial or for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of this state."
When ruling on a motion for a new trial, the trial justice sits as a "super juror" by independently evaluating all of the material evidence and assessing the credibility of witnesses. Rezendes v. Beaudette,797 A.2d 474, 477 (R.I. 2002). After reviewing and evaluating the evidence, the trial justice should deny the motion for a new trial if the evidence indicates that reasonable minds might reach different conclusions. Perkins v. City of Providence, 782 A.2d 655, 656 (R.I. 2001) (citing Kurczy v. St. Joseph Veterans Association, Inc., 713 A.2d 766, 770 (R.I. 1998)). Furthermore, "the jury's verdict will remain unchanged if the reviewing court, upon looking at the record in the light most favorable to the prevailing party, finds any competent evidence which sustains the jury's verdict." Fox v. Allstate Ins. Co., 425 A.2d 903, 907 (R.I. 1981) (quoting Powers v. Carvalho, 117 R.I. 519, 525, 368 A.2d 1242, 1246 (1977)). Only where the verdict "fails to respond truly to the merits of the controversy and to administer substantial justice and is against the preponderance of the evidence," should the court set aside the jury's verdict and order a new trial. Galusha v. Carlson, 120 R.I. 204, 206-206, 386 A.2d 634, 635 (R.I. 1978).
 Disability Discrimination
Plaintiff alleges disability discrimination based on RICRA, FEPA, and RIPDA.[2] Defendants contend that reasonable minds could reach different conclusions as to whether Plaintiff established the elements of a disability discrimination claim. In support thereof, Defendants rely on federal case law which applies the Americans with Disabilities Act ("ADA"), contending that reasonable minds could reach different conclusions as to whether (1) Plaintiff suffers from a condition which qualifies as a disability under the act and/or (2) Plaintiff established that DBR's proffered reasons for relocating Evans to a cubicle were pretextual. Plaintiff asserts that reliance on ADA case law is misplaced.
Chapter 87 of the Rhode Island General Laws, entitled "Civil Rights of People with Disabilities" ("RIPDA") states:
 "No otherwise qualified person with a disability shall, solely by reason of his or her disability, be subject to discrimination by any person or entity doing business in the state; nor shall any otherwise qualified person with a disability be excluded from participation in or denied the benefits of any program, activity or service of, or, by any person or entity regulated, by the state or having received financial assistance from the state or under any program or activity conducted by the state, its agents or any entity doing business with the state." G.L. 1956 § 42-87-2.
In general, RIPDA mirrors its federal counterpart, the ADA, with respect to the definition of a disability. Both acts define a disability to be "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." G.L. 1956 § 42-87-1(4)(i); 42 USCS § 12102(2)(A). Therefore, courts have applied ADA case law in determining whether a plaintiff's impairment qualifies as a disability under RIPDA. Tardie v. Rehabilitation Hosp., 6 F. Supp.2d 125, 134 (D.R.I. 1998) (finding that a condition not qualifying as disability under the ADA may not be deemed a disability under RIPDA).
However, courts are cautious to apply ADA case law unconditionally to RIPDA claims because RIPDA may be distinguished from the ADA in one important respect. RIPDA, unlike the ADA, defines a disability "without regard to the availability or use of mitigating measures, such as reasonable accommodations, prosthetic devices, medications or auxiliary aids." G.L. 1956 § 42-87-1.
In the instant case, the jury was instructed that to establish a prima facie case of discrimination under the ADA, a plaintiff must prove: (1) she has a disability; (2) she is otherwise qualified to perform the essential functions of the position with or without reasonable accommodations; and (3) she was discriminated against because of her disability. Weigert v. Georgetown Univ., 120 F. Supp.2d 1, 9 (D.D.C. 2000); see also Phelps v. Optima Health, Inc., 251 F.3d 21, 24 (1st Cir. 2001). Following the burden shifting framework established in McDonnellDouglas Corp. v. Green, 411 U.S. 792, 802-803, 93 So. Ct. 1817, 1824 (1973), if Plaintiff introduces evidence supporting each element, the burden then shifts to Defendant. See Phelps, 251 F.3d at 24; see alsoTaylor v. Pepsi-Cola Co., 196 F.3d 1106, 1109 (10th Cir. 1999) (finding "[t]he burden shifting analysis established in McDonnell Douglas . . . applies to ADA claims"). Defendant then must overcome the presumption of discrimination by establishing a legitimate nondiscriminatory purpose for the adverse action. McDonnell Douglas, 411 U.S. at 802-803, 93 S.Ct. at 1824; see also Phelps, 251 F.3d at 24. Thereafter, Plaintiff may show that the purpose proffered by Defendant is merely pretextual, and discriminatory animus genuinely motivated the action. Id. Nevertheless, the burden of persuasion remains with the plaintiff at all times. St.Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993).
 Disability
In order to establish a prima facie case of disability discrimination, Plaintiff must initially establish that she is disabled. Thus, before showing Plaintiff's impairment qualifies as a disability under the law, Plaintiff must demonstrate that she in fact suffers from an impairment. To evince this, Plaintiff offered testimony of her treating physician, Dr. David Mayer, M.D. This Court found Dr. Mayer to be glib, smug, and unprofessional — singularly unimpressive. His testimony was rife with inconsistencies. Specifically, he testified that he sent a letter to the DBR on July 7, 2003, attesting to Plaintiff's claustrophobic condition. However, Dr. Mayer stated, and his records indicate, that he first diagnosed this disease on July 17, 2003. Notwithstanding such testimony, Dr. Mayer further testified that he believes he diagnosed Plaintiff with this disease as early as 1993; again, his records do not substantiate this. His rationale for his atrocious record-keeping — i.e. his medical notes might embarrass a patient at some point — is laughable. Moreover, his sophomoric written exchange with Plaintiff, his patient, is unprofessional and further undermines his credibility.
This Court found Dr. Mayer's testimony unconvincing and unpersuasive. Certainly, the discrepancies in the testimony offered by Dr. Mayer, and his inability to substantiate his testimony with medical records, could cause a reasonable person to conclude that Plaintiff did not suffer from claustrophobia. The jury is not obligated to believe the testimony of any witness. Rather the jury is obligated to determine if the witness is credible and believable. Cuddy v. Schiavonne, 568 A.2d 1387, 1391 (R.I. 1990) (stating "[t]he fact that plaintiffs' testimony is uncontradicted by defendant's direct testimony . . . does not compel acceptance of plaintiffs' positive testimony if that testimony contains inherent improbabilities and contradictions which alone or in connection with other circumstances in evidence affect its credibility").
To further support the existence of the impairment, Plaintiff also offered a letter from a former employer stating that her claustrophobia presented a problem in that office. However, Plaintiff did not disclose this impairment as a disability when she was hired because she did not believe it would become a problem. It is questionable whether Plaintiff can logically believe her claustrophobia would not pose a problem in the workplace when it had already presented itself as such in another office. Again, this Court, having independently evaluated the evidence, doubts the veracity of this testimony and finds reasonable minds could reach different conclusions on this issue.
Nevertheless, assuming, arguendo, that Plaintiff did suffer from claustrophobia, it must qualify as a disability under the law to sustain a claim. RIPDA defines a person with a disability to be "any person who: (i) [h]as a physical or mental impairment which substantially limits one or more major life activities." G.L. 1956 § 42-87-1(7)(i). Major life activities include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." G.L. 1956 § 42-87-1(5).
Similarly, under the ADA, a disability is defined as a condition which substantially limits major life activities. "[T]he [Equal Opportunity Commission] has defined `major life activities' to include functions such as `caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" Gillen v. FallonAmbulance Serv., 283 F.3d 11, 21 (1st Cir. 2002) (citing29 C.F.R. § 1630.2(i)); see also Katz v. City Metal Co., 87 F.3d 26, 31 (1st Cir. 1996). Accordingly, this Court again will analyze this claim pursuant to the law as developed under the ADA, with the exception of the application of mitigating circumstances.
"To demonstrate an impairment in working, a plaintiff must demonstrate that his condition places a significant restriction on his `ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.'" Ross v. Boeing Co., 1995 U.S. Dist. LEXIS 7722, 4 Am. Disabilities Cas. (BNA) 1095 (D. Kan. 1995) (citing Bolton v. Scrivner,Inc., 36 F.3d 939, 942 (10th Cir. 1994) (quoting29 C.F.R. § 1630.2(j)(3)(i)); see also Gillen, 283 F.3d at 21. Courts may consider the nature, severity, duration, and permanence of the impairment, as well as evidence of availability of various jobs within the area accessible to the plaintiff to determine whether an individual is able to perform a class of jobs. Gillen, 283 F.3d at 21 (referencing 29 C.F.R. § 1630.1630.2(j)).
In the instant case, Plaintiff asserts that she suffered from claustrophobia and that this condition was exacerbated by her assignment to work in a cubicle. Admittedly, Plaintiff need only have one major life activity substantially impaired as a result of her condition; working qualifies under the law as a major life activity. However, Plaintiff has not demonstrated that this activity was substantially limited as a result of her impairment. Nor did Plaintiff demonstrate that her claustrophobic condition was severe.
Specifically, Plaintiff admitted to sitting in the backseat of a car, in an airplane, and in a bathroom stall. Likewise, she could utilize a shower stall without difficulty. These spaces are significantly more confining than a cubicle, which was reconfigured for Plaintiff's comfort to have only two partial walls. Furthermore, although she was prescribed medication to combat her claustrophobia, there was scant testimony as to the frequency with which she took the medication or the period of time in which she took it. Finally, she was able to perform her job. The extent of the testimony as to the effect the claustrophobia had on her work was that she had difficulty concentrating.
The testimonial evidence is riddled with discrepancies. Specifically, Plaintiff's testimony regarding her reaction to small spaces was inconsistent. See Madeira v. Pawtucket Housing Authority, 105 R.I. 511, 515, 253 A.2d 237, 239 (1969) ("Since credibility is purely a factual issue, the trier of fact can pick and choose from the witness's entire testimony that portion which he [or she] finds worthy of belief or reject all of his [or her] testimony as incredible.") Furthermore, by her own admission, her alleged claustrophobia only slightly affected her in the workplace, namely that she occasionally had difficulty concentrating. Accordingly, reasonable minds could reach different conclusions as to whether Plaintiff suffered from an impairment qualifying as a disability according to the standards as established under the ADA and, therefore, also RIPDA.
 Qualified for the Benefit
In addition to establishing her disability, Plaintiff must also demonstrate that she was qualified for the benefit in question, namely qualified to remain in the office. In the instant case, testimony as to Plaintiff's capabilities and job responsibilities was lengthy and detailed. Plaintiff and her former supervisor, Rollin Bartlett ("Bartlett"), testified that Plaintiff handled extremely complex and highly confidential matters. Specifically, Plaintiff processed coverage questions which might encompass an explanation of medical history or current illness. For these reasons, Bartlett recommended that Plaintiff be returned to an office, where she could handle these matters while still protecting the callers' privacy.[3]
Contradictory testimony was offered by Joseph Torti ("Torti"), Associate Director and Superintendent of the Insurance Regulation Division. Specifically, Torti explained that any able employee could artfully and delicately discuss these problems without disclosing specific, private information. Plaintiff simply needs to employ care while maneuvering through these conversations. In addition, as to the complexity of Plaintiff's job, Torti explained that, in fact, the examiners handle much more complicated matters, including reviewing hundreds of pages of financial statements of multi-billion dollar corporations, yet every examiner sits in a cubicle. Therefore, in Torti's opinion, Evans did not need an office to work effectively and productively. This testimony offered by Torti was credible.
Furthermore, there was a great deal of testimony regarding Plaintiff's work product. Specifically, while testifying, Plaintiff was asked to read aloud a letter which she drafted for external publication. Although the letter was riddled with basic grammatical mistakes, Evans testified that it was representative of her work product. In defense thereof, Evans testified that her co-workers were also guilty of sloppy work. However, her co-worker, Philip Sheridan ("Sheridan"), testified that he would not have made such gross mistakes.
Furthermore, the testimony revealed that Plaintiff and Philip Sheridan devised a plan to prove that Mastrostefano harbored ill-will towards Evans, whereby Sheridan — a self-described "English major" — ghost-wrote a letter for Plaintiff, and submitted that letter to Mastrostefano for his approval. Apparently, Mastrostefano did not typically criticize Sheridan's work. Nevertheless, this letter, despite its true author's efforts, was subject to a scrupulous critique. Having reviewed the letter, this Court notes that this letter, like that drafted by Evans herself, was riddled with grammatical mistakes — mistakes which Sheridan acknowledged. Again, given the conflicting testimony, this Court finds that reasonable minds could certainly reach different conclusions as to whether Evans was qualified to retain an office at the DBR.
 Legitimate Non-discriminatory Reason for Placement
Under the burden shifting approach, Defendants may offer a legitimate, nondiscriminatory reason for the adverse employment action. Defendants in the instant case contend that the hire of a new employee, Molly Seward ("Seward"), necessitated switching Plaintiff from an office to a cubicle. At that time, Plaintiff was the lowest ranking employee with an office and therefore, the DBR chose to take her office for Seward.
 Pretext
This Court is mindful that a finding of pretext is extremely fact sensitive. Specifically, the fact finder is required to consider the totality of the circumstances to determine if the plaintiff has effectively rebutted the employer's proffered reason for the adverse action. Chungchi Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 39 (1st Cir. 2003). "This court has consistently held that determinations of motive and intent, particularly in discrimination cases, are questions better suited for the jury, as proof is generally based on inferences that must be drawn, rather than on the proverbial `smoking gun.'" Petittiv. New England Tel. Tel. Co., 909 F.2d 28, 34 (1st Cir. 1990).
Plaintiff claims that the proffered reason for the relocation was pretextual because at three different times various offices became vacant, one of which continues to remain unoccupied. Yet, despite these vacancies, Plaintiff was not relocated to any of these offices. Therefore, Plaintiff contends that this evidence, taken cumulatively, indicates a discriminatory motive.
However, Defendants asserted legitimate reasons for keeping Plaintiff in a cubicle. Specifically, Marilyn Shannon McConaghy, Director of DBR, testified that Seward's office was not offered to Plaintiff after Seward left because the department needed to create a mailroom. Director McConaghy, whom this Court found to be compelling and candid, further testified that a mailroom addressed many problems, namely that it reduced the noise of the dot matrix printers, created a centralized area for printing and copying, and provided a secure place for the mail to be sorted.
Elizabeth Kelleher Dwyer ("Dwyer"), Department Chief of Legal Services, who relocated to the office which next became available, testified as to the necessity of her relocating to the insurance division. In fact, almost immediately after being hired at DBR, she requested to be relocated to the insurance division. Dwyer testified that her position required constant contact with the members of the insurance division and the move facilitated that contact. In addition, she testified that she sought to be moved to the vacant office in the insurance division because her office, being much smaller than the vacant office, was filled to capacity with insurance and legal documents. Furthermore, Joseph Torti testified that he had been insisting on relocating Dwyer to the insurance division when a full-time employee position in that division was eliminated. Torti believed that Dwyer's presence would help alleviate some of the insurance division's work load. Dwyer's testimony was candid, thoughtful, and credible.
As to the office which remains vacant, Torti testified that it is being left empty until the position of Deputy Chief Examiner is funded. As this position is desperately needed, DBR is actively lobbying for the position's funding and anticipates that the legislature will approve funding.[4] Accordingly, Defendants chose to leave this office available for the next Deputy Chief Examiner.
Given the extensive testimony regarding the reason for Plaintiff's relocation and continued placement in a cubicle, this Court is satisfied that a reasonable jury, responsible for evaluating and determining the credibility of the witnesses, could have reasonably reached the conclusion that the proffered reasons were not mere pretext. For all of the foregoing reasons, Plaintiff's Rule 59 motion is denied for all counts alleging disability discrimination.
 Retaliation
Plaintiff contends that she suffered adverse employment actions after she filed a complaint with the DHS and instituted the present suit. However, Defendants assert that reasonable minds could reach different conclusions as to whether Plaintiff demonstrated that (1) she engaged in protected activity of which her employer was aware; or (2) a negative employment action was taken in response to Plaintiff's protected activity.
In order to state a prima facie case of retaliation, Plaintiff must show (1) she engaged in protected conduct; (2) she was thereafter subject to an adverse employment action; and (3) the adverse employment action was causally connected to the protected conduct. Che v. MBTA, 342 F.3d 31, 38 (1st Cir. 2003). As it is often difficult to establish the third prong of a retaliation test, the fact finder is entitled to infer a causal nexus between the adverse employment action and the protected conduct if those two occurrences share temporal proximity. Russel v. Enterprise, etal., 160 F. Supp.2d 239, 264 (D.R.I. 2001); Ruffino v. State Street Bankand Trust, 908 F. Supp. 1019, 1046 (D.Mass. 1995). Again, if Plaintiff establishes a prima facie case of retaliation, then the fact-finder employs the burden shifting test discussed in the previous section. Defendant has the opportunity to present evidence of a legitimate non-discriminatory reason for its actions and Plaintiff may rebut this by showing pretext. Hazel v. United States Postmaster Gen., 7 F.3d 1, 6-7 (1st Cir. 1993). Again, the burden of persuasion remains with the plaintiff. St. Mary's Honor Ctr., 509 U.S. at 511.
This Court will address whether Plaintiff has established a prima facie case of retaliation in the Rule 50 discussion to follow. Therefore, for the purposes of this Rule 59 motion, this Court will assume, arguendo, that Plaintiff established a prima facie case of retaliation.
Plaintiff filed a charge of discrimination with DHS on September 29, 2000. Plaintiff was initially asked to move to a cubicle prior thereto, on July 17, 2000. As stated previously, three offices became available at different points thereafter, and one continues to remain vacant. Therefore, the sequence of events indicates that this Court is constrained to consider only those three offices which became vacant following Plaintiff's initial relocation to a cubicle.
As discussed earlier, Defendants presented extensive evidence as to the legitimate reasons for not returning Plaintiff to an office. For an extensive analysis thereof, this Court relies on the previous section.[5]
Again, in light of conflicting testimony on this issue, this Court finds that a reasonable jury, weighing the witnesses' credibility, could conclude that the Plaintiff's relocation was not the result of her decision to file a complaint with DHS. Accordingly, Plaintiff's motion for a new trial with regard to her claims of retaliation is denied.
 Rule 50
Rule 50 of Super. R. Civ. P. provides in pertinent part:
 "Whenever a motion for a judgment as a matter of law made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Such a motion may be renewed by service and filing not later than 10 days after entry of judgment. . . . If a verdict was returned, the court may, in disposing of the renewed motion, allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as a matter of law. . . ."
Under Rule 50(b), a party may renew a motion for judgment as a matter of law which was denied or not granted at the close of the evidence within 10 days after entry of judgment. To determine a motion for judgment as a matter of law, the trial justice is required to "consider the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of the witnesses, and draw from the record all reasonable inferences that support the position of the nonmoving party." Skaling v. Aetna Ins. Co., 742 A.2d 282, 287 (R.I. 1999). Additionally, "if, after such a review, there remain factual issues upon which reasonable persons might draw different conclusions, the motion for judgment as a matter of law must be denied." Id. However, where the evidence supports only one conclusion, namely that the Plaintiff may not prevail, judgment as a matter of law must be granted.Id. at 252 (citing Kenney Manufacturing Co. v. Starkweather Shepley,643 A.2d 203, 206 (R.I. 1994)).
 Gender Discrimination
In order to survive judgment as a matter of law, Plaintiff must establish a prima facie case of discrimination. This may be accomplished through direct evidence or by showing that Plaintiff was subject to disparate treatment. Specifically, Plaintiff must establish: "(1) she is a member of a protected class; (2) her employer took an adverse employment action against [her]; (3) she was qualified for the employment; and (4) . . . other similarly situated employees who were not members of the protected class were treated more favorably." Kosereis v.Rhode Island, 331 F.3d 207, 212 (1st Cir. 2003); see alsoRodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 19 (1st Cir. 1999). "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253-254 (1980); see also Swallow v. Fetzer Vineyards, 46 Fed. Appx. 636, 643 (1st Cir. 2002).
At the outset, Plaintiff's gender discrimination claim must fail as a matter of law as she has failed to establish two elements necessary to form a prima facie case. Specifically, Plaintiff failed to establish that she suffered an adverse employment action and similarly situated males were treated differently.
 Adverse Employment Action
The actions alleged to be adverse in the instant case do not meaningfully and sufficiently affect Plaintiff's employment such that they rise to the level of adverse employment actions. In order to constitute an adverse employment action, "a plaintiff must identify a materially adverse change in the terms and conditions of his employment."Hollins v. Atlantic Co., 188 F.3d 652, 662 (6th Cir. 1999); see alsoMarrero v. Goya of P.R., Inc., 304 F.3d 7, 23 (1st Cir. 2002). "[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Marrero, 304 F.3d at 23 (citing Crady v. Liberty Nat'lBank and Trust Co., 993 F.2d 132, 136 (7th Cir. 1993)). "Otherwise every trivial personnel action that an irritable . . . employee did not like would form the basis of a discrimination suit." Marrero, 304 F.3d at 23. (citing Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 274 (7th Cir. 1996)). In examining actions alleged to be adverse, courts are admonished of the fact that
 "[w]ork places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action. . . . Typically, the employer must either . . . take something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities or withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for promotion after a particular period of service." Horney v. Westfield Gage Co., 77 Fed. Appx. 24; 2003 U.S. App. LEXIS 20776 (1st Cir.) (denying a claim for gender discrimination because Plaintiff failed to establish that her employer acted adversely) (citing Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996)).
In Williams, the plaintiff filed an age discrimination suit because he, a salesman, was reassigned to another sales territory. Williams, 85 F.3d at 272. The reassignment resulted in a reduction in salary, as his salary was based in part on commission. Id. However, the court found neither his transfer nor the minor decrease in salary rose to the level of an adverse employment action. Id. at 274. Plaintiff was therefore unable to establish a prima facie case of age discrimination on those bases. Id. at 275.
Plaintiff relies on three actions which she alleges to be adverse. Specifically, Plaintiff contends that the following constitute adverse employment actions: (1) she was relocated from an office to a cubicle; (2) she remained in a cubicle although three offices became available, one of which remains vacant; and (3) she was forced to comply with a sign-in system which monitored the time she spent in the office. These actions do not constitute adverse employment actions as contemplated by our courts. See Brown v. MM/Mars, 883 F.2d 505 (7th Cir. 1989) (employee terminated as a result of age discrimination); see also Kocsisv. Multi-Care Management, Inc., 97 F.3d 876, 885 (6th Cir. 1996) ("Reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims."); see also Randlett v. Shalala, 118 F.3d 857, 862 (1st Cir. 1997) (discussing whether certain actions of an employer rise to the level of an adverse impact regarding "compensation, terms, conditions, or privileges of employment"). DBR and Mastrostefano simply reassigned Plaintiff to a new work area. In addition, the Collective Bargaining Agreement provided for a monitoring system. Defendants simply activated this system to account for Plaintiff's time; by her own admission, the system was instituted on account of, and subsequently corrected, her chronic lateness. Plaintiff's position, rate of pay, benefits, and job responsibilities remained unchanged.
Considering this evidence in the light most favorable to Plaintiff, this Court finds the evidence supports only one conclusion, namely that Plaintiff has not established that she was subject to an adverse employment action. For the foregoing reasons, Defendants' Rule 50 motion is granted for claims alleging gender discrimination.
 Similarly Situated Employees
In addition, Plaintiff's gender discrimination fails because she has not demonstrated that the employer treated other similarly situated males more favorably. In Dartmouth Review v. Dartmouth College, 889 F.2d 13, 18-20 (1st Cir. 1989), the court reasoned:
 "It is apodictic that evidence of past treatment toward others similarly situated can be used to demonstrate intent in a . . . discrimination suit. To put flesh upon the bare bones of this theory, appellants' obligation was to identify and relate specific instances where persons situated similarly `in all relevant aspects' were treated differently. . . . The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Much as in the lawyer's art of distinguishing cases, the `relevant aspects' are those factual elements which determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples."
In the instant case, Plaintiff has failed to establish this prong. No male in her office was similarly situated in "all relevant aspects." Admittedly, the two other male senior rate analysts, Philip Sheridan and Robert Drouin, were neither subject to monitoring, nor relocated. However, both of these men were senior to Plaintiff, having accrued more years with the State. Most importantly, neither of these men was chronically late, which would necessitate the type of monitoring to which Plaintiff was exposed. In fact, the only person to whom Plaintiff could possibly be compared would be Joseph Torti, who admitted to being frequently, although not chronically, late. However, Torti holds a senior position and is also known to be an extremely hard worker, often working until late in the evening. Therefore, Plaintiff's chronic lateness and lower rank distinguish her from all the other male employees in her department. Accordingly, Plaintiff has failed to establish that she was treated differently from similarly situated males in her office, thereby failing to establish a prima facie case of gender discrimination. For these reasons, Defendants' motion for judgment as a matter of law for claims alleging gender discrimination are granted.
 Disability Discrimination and Retaliation
Having previously discussed the elements necessary to create a prima facie case of disability discrimination and retaliation, this Court notes that in each, a plaintiff must establish that he or she was subjected to an adverse employment action. See Kriegel v. Rhode Island,266 F. Supp.2d 288, 296 (D.R.I.) (finding a necessary element in a successful disability discrimination claim is that the employee suffered an adverse employment action); see also Hodgens v. General DynamicsCorp., 144 F.3d 151, 161 (1st Cir. 1998) (finding a necessary element in a successful retaliation claim is that the employee suffered an adverse employment action). The analysis employed to determine if an employment action constitutes an adverse employment action is reflected in the gender discrimination analysis discussed above.
In the instant case, nothing tangible was taken from the employee, Evans. Evans was not terminated; Evans was not demoted; Evans retained all of her job responsibilities; Evans incurred no loss of benefits. Only after Plaintiff was moved to the cubicle did Defendants become aware of her disability and of her DHS charge; therefore, the action on which Plaintiff may rely to establish an "adverse employment action" is that Plaintiff was repeatedly refused offices once they became available. This alone is insufficient to establish Plaintiff was subjected to an adverse employment action. Again, disgruntled employees are not permitted to recover for trivial personnel actions. Marrero, 304 F.3d at 23. Accordingly, this Court finds that Plaintiff failed to establish a prima facie case of disability discrimination and retaliation and grants Defendants' motion for judgment as a matter of law on these claims.
 Hostile Work Environment
A hostile work environment has been defined as
 "sexual or racial conduct [which] has the purpose or effect of unreasonably interfering with a person's work performance or creating intimidating, hostile or offensive work environment, and the plaintiff must show that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment; relatively minor inconveniences or irritations which the employee `suspects' relate to her race or sex are not actionable." Foxon Packaging Corp. v. Rhode Island Comm'n for Human Rights, 1990 R.I. Super. LEXIS 135 at 15; see also O'Rourke v. City of Providence, 235 F.3d 713, 738 (1st Cir. 2001); see also Hirase-Doi v. U.S. West Communs., Inc., 61 F.3d 777, 782 (10th Cir. 1995).
Therefore, in order to establish a claim of hostile work environment, a plaintiff must prove the following elements:
 "(1) that she (or he) is a member of a protected class;
 (2) that she was subjected to unwelcome sexual harassment;
 (3) that the harassment was based upon sex;
 (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment;
 (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and
 (6) that some basis for employer liability has been established." O'Rourke, 235 F.3d at 738 (citing Faragher v. City of Boca Raton, 524 U.S. 775 (1998)).
Establishing such a claim is relatively onerous. Comments which occur infrequently or amount to simple teasing are insufficient to create a hostile work environment. Faragher v. City of Boca Raton, 524 U.S. at 787. "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a `general civility code.' Properly applied, they will filter out complaints attacking `the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" Id. (citations omitted). Clearly, under the law, Plaintiff must prove that the complained of conduct was extreme and pervasive.
Plaintiff relies on a total of ten comments, allegedly made by Mastrostefano over the course of a ten-year period. However, Defendants presented conflicting testimony as to whether these comments were actually made. Plaintiff's witness, Alicia Mildner, a licensing aide for the DBR, testified on cross-examination that she never heard Mastrostefano swear. Sharon Gordon ("Gordon") did testify that during a managers' meeting, Mastrostefano made a "stupid" and "inappropriate" comment to her but Evans was not present when the comment was made. Candace Casala, one of Evan's coworkers and friends, testified that she later heard about the comment made to Gordon but was unable accurately point to the time of the comment. Lorraine Hynes, Program Planner Specialist, testified that she worked well with Mastrostefano, and although they worked together during very stressful "legislative crunches", he was always professional. Sarah Tolentino testified that she never heard Mastrostefano swear. Matthew DiMaio testified that he heard Mastrostefano refer to Plaintiff using crude sexual terms but never mentioned it until "all this started." Finally, Robert Drouin, Senior Insurance Rate Analyst, testified that he was concerned with Mastrostefano's managerial style towards both men and women, but also that he never heard Mastrostefano make inappropriate comments regarding gender. Clearly, as there is conflicting evidence as to whether Mastrostefano made inappropriate remarks, this Court finds that reasonable persons could reach different conclusions as to whether Evans was sexually harassed.
Furthermore, Plaintiff failed to show that the conduct was either extreme or pervasive. Although many of the comments upon which Plaintiff relies were extremely vulgar and distasteful, at most, these comments merely amount to "sporadic use of abusive language [and] gender-related jokes" because so few comments were made over the course of many years. In addition, although evidence of the harassment of coworkers is admissible to establish a hostile work environment claim, see Hurley v.Atlantic City Police Dep't., 174 F.3d 95, 110 (3rd Cir. 1999), Mastrostefano's comments were never directed to Plaintiff. Either Plaintiff overheard these comments or Plaintiff's co-workers relayed these comments to her, sometimes years after the fact. Additionally, Plaintiff allegedly overheard only those comments concerning persons other than herself, specifically her co-workers. Therefore, these comments do not rise to the level of severe or extreme behavior necessary to constitute a hostile work environment.
Moreover, notwithstanding counsel's eloquent attempts to depict otherwise, Evans was not a compelling witness. By all accounts, including her own, Plaintiff was provocative in word and deed. Evans' language — at best — was inappropriate and unprofessional; at worst — it was crude, scatological, sexually uncensored, and graphic. Her e-mailed photos to a male co-worker are indescribably prurient. Although the above does not and would not excuse the alleged behavior of Mastrostefano, it is difficult, if not impossible, to imagine Evans being "aghast," intimidated, or demoralized in any context. Nonetheless, the evidence of Mastrostefano's comments alone lacks the severity and pervasiveness necessary to constitute a hostile work environment.
In further support of her claim, Plaintiff points to the system of monitoring. Specifically, Plaintiff states that Mastrostefano monitored her visually by constantly passing by her office and cubicle, and that he insisted that Rollin Bartlett institute a sign-in system for her alone. However, this system does not amount to a severe act which alters the terms and conditions of employment. Rather, the evidence, including Plaintiff's own testimony, demonstrates that this system was a necessary step to combat Plaintiff's chronic lateness. Accordingly, Plaintiff failed to establish that the conduct in question was sufficiently severe or pervasive to establish a claim for hostile work environment.
Finally, with regard to the cubicle placement, this Court, after an exhaustive analysis above, additionally finds that this action is not one which alters the terms and conditions of employment. Hollins v. AtlanticCo., 188 F.3d at 662. Therefore, this Court finds that Plaintiff has failed to establish that she was subjected to a hostile work environment as the complained of conditions were not sufficiently severe or pervasive to alter the terms and conditions of employment. Accordingly, Defendants' motion for judgment as a matter of law for the claim of hostile work environment is granted.
 Conclusion
In sum, virtually all of the witnesses called by Evans — male and female — failed to substantiate her allegations. Virtually all of the witnesses called in Plaintiff's case, representing various rungs on the DBR hierarchical ladder, were counterproductive, if not damning, to her various claims. Whatever Mastrostefano's shortcomings in managerial style, his conduct was even-handed. To the extent Plaintiff was monitored and/or reprimanded, such action was clearly warranted. Her tardiness was chronic, spanning years. Her work product was shoddy. She was unprofessional.
For the foregoing reasons, this Court finds that reasonable minds could reach different conclusions as to whether Plaintiff was the subject of disability discrimination and/or retaliation based on an alleged impairment of claustrophobia and the filing of a discrimination charge with DHS. Accordingly, this Court denies Plaintiff's motion for a new trial pursuant to Rule 59 of the Rhode Island Superior Court Rules of Civil Procedure. In addition, this Court finds that Plaintiff failed to establish a prima facie case of gender discrimination, disability discrimination, retaliation, and hostile work environment. Therefore, this Court grants Defendants' motion for judgment as a matter of law pursuant to Rule 50 of the Rhode Island Superior Court Rules of Civil Procedure.
Counsel shall present an appropriate order for entry.
[1] Applying the principles established in Pellegrino v. R.I. EthicsComm'n., 788 A.2d 1119 (R.I. 2002) and Folan v. State/Department ofChildren, Youth, Families, 723 A.2d 287 (R.I. 1999), Justice Rubine, in a Rhode Island Superior Court case, found that state sovereign immunity was waived under RICRA.
[2] Claims of disability discrimination, whether sounding in disparate treatment under FEPA, RICRA, or RIPDA, all follow the same analytical framework. See Iacampo v. Hasbro, Inc., 929 F. Supp. 562, 575 (D.R.I. 1996) (applying the McDonnell Douglas analytical framework to FEPA claims); see also Resare v. Raytheon Co., 981 F.2d 32, 39-44 (1st Cir. 1992) (applying Title VII "mixed-motive" and "pretext" theories of disparate treatment discrimination to FEPA); see also Kriegel v. RhodeIsland, 266 F. Supp.2d 288, 296 (D.R.I.) (applying the McDonnell Douglas
analytical framework to FEPA and RICRA claims); see also Tardie v.Rehabilitation Hosp., 6 F. Supp.2d 125, 134 (D.R.I. 1998) (applying theMcDonnell Douglas analytical framework to RIPDA claims). Hereinafter, the disability claims will be discussed with reference to RIPDA, but the reasoning employed also will apply to the disability claims framed as FEPA and RICRA violations.
[3] It should be noted that Bartlett seemed a less-than-enthusiastic witness. In addition to Plaintiff's chronic tardiness, he acknowledged concerns about Plaintiff's work product and backlogs.
[4] It is patently obvious that DBR cannot testify with certainty that the position will be funded, as funding is at the discretion of the Legislature.
[5] This Court is quick to point out that this jury was particularly attentive, specifically requesting that the testimony of Director McConaghy, regarding the reason for switching Plaintiff's workspace to a cubicle, be reread. That testimony was as follows:
 "Q. Now, Director, you are not a micro-manager, why did you get involved in Miss Evans' seating arrangements?
 A. Well, because she filed some claims, that's why I got involved in the seating arrangements."
This answer could be interpreted in a number of ways, specifically because the question was not framed as "why didn't you give plaintiff an office?"